STERNS LUMBER COMPANY

*vs.*

PENOBSCOT BAY ELECTRIC COMPANY.

Penobscot.    Opinion April 13, 1922.

*If under its charter a corporation created for the purpose of constructing a dam to store and retain water for driving purposes is authorized to charge tolls, it is under a reciprocal duty and obligation to store and retain an adequate supply of water for driving purposes.   Loss of profits, if shown with reasonable certainty, and proven to be the proximate result of defendant's wrong, may be recovered.*

In the instant case under the original Charter of 1899, specified rates of toll were established by the Legislature and the right to charge tolls imposed the corresponding obligation to store and retain an adequate supply of water for driving purposes.   The right and the duty were reciprocal.

Under this charter the right of the log owner was made paramount.   He was given the priority.

The amendment of 1903 enlarged the rights of the corporation as to the use of the water when not needed for log-driving purposes, but under the proviso in that act the prior and superior rights of the log owner were preserved intact.   The duty continued to be imposed upon the corporation to accumulate and store, as well as to discharge when stored, the requisite amount of water for driving purposes.

The defendant is subject to the same obligations in these respects as was the original company.   All the duties as to driving devolving upon the Wilson Stream Dam Company before the mergers were assumed in the mergers and now rest upon the defendant.

Therefore the plaintiff's rights in the case at bar are paramount to the defendant's, and it was the duty of the defendant to accumulate and retain as well as to store and discharge an adequate supply of water for plaintiff's use.

The referees found as a fact that neither in 1917 nor in 1918 at the beginning of nor during the driving season was there stored an adequate head for driving purposes, so that liability is fixed and the only remaining question is that of damages.

Damages in 1917 have been fixed by the referees at $3,000.   This finding is final

Damages in 1918 comprise two elements, first, the plaintiff's loss caused by delay and additional expense in driving due to an insufficient head, and this was fixed by the referees at $5,000.    This also is final.

The second element is loss of profits.    If this loss is proven to be the proximate . result of the defendant's wrong and the profits can be shown with reasonable certainty, then they can be recovered.

In this case both these necessary elements are found by the referees as facts in their report, and these findings leave no question of law open for the court. They fixed the damage through loss of profits at $12,000.

The conclusion, therefore, is that the  defendant is liable for $3,000 damages in 1917 and $17,000 in 1918.

On report on questions of law.    This is an action to recover damages sustained by plaintiff because of the alleged nonfeasance and misfeasance of the defendant in the storage and use of water in the Wilson Stream Dam in the years 1917 and 1918.    The plaintiff owned and operated a lumber mill on the Penobscot River at Hampden, and during said years carried on lumbering operations on and near Wilson Stream in Piscataquis County to obtain logs for its mill, and Wilson Stream was the only route for driving its logs to Sebec Lake and thence to the Penobscot River.    The defendant corporation is a public service corporation, owning dams, penstock, power station and transmission lines on Wilson Stream.    The Wilson Stream Dam Company was incorporated by Chapter 64 of the Private and Special Acts of 1899 for the benefit of log owners, but not to store and hold back and retain any water except during such times as it was required for driving purposes.    The powers of the company were enlarged by subsequent legislation giving it authority to store and hold water at all seasons and for practically all commercial purposes, but with the proviso that "the water stored in said dam shall be used at all times so far as necessary for log driving purposes on Wilson Stream."    In 1909 the Greenville Light and Power Company succeeded to the rights and duties of the Wilson Stream Dam Company, and in 1915 defendant corporation acquired all the property, rights, privileges and franchises of the Greenville Light and Power Company.    Under the original charter of the Wilson Stream Dam Company specified rates of toll were established.    During the seasons of 1917 and 1918 plaintiff alleges that defendant did not store and retain an adequate supply of water for driving purposes, as it was under obligation to do as a reciprocal duty to its right to

charge toll, and as a result it sustained damages caused by delay and additional expenses in driving due to an insufficient head of water, and that it also suffered loss of profits resulting therefrom.   Defendant pleaded the general issue and a brief statement alleging among other things that the shortage of water was due to the unprecedented and unexpected drought upon the watershed of Wilson Stream and tributaries.

The case was referred to two Justices of the Supreme Judicial Court who found the facts and reported certain questions of law to the Law Court under Rule XLV.   In the report of the referees which was accepted the damage in 1917 was fixed at $3,000, and in 1918 at $5,000, and the damage through loss of profits at $12,000.   By agreement of the parties the case was reported for the decision of the Law Court upon the questions of law reported by the referees and upon their findings of fact in accordance with the legal rights of the parties. Judgment for plaintiff for $20,000 with interest from date of writ and costs.

The case is fully stated in the opinion.

*Matthew Laughlin and Ryder & Simpson,* for plaintiff.

*Harvey D. Eaton, Merrill & Merrill and Everett Maxcy,* for defendant.

SITTING:  CORNISH, C. J., SPEAR, HANSON, PHILBROOK, MORRILL, WILSON, JJ.

CORNISH, C. J.   This is an action on the case brought by the plaintiff, a log owner, to recover damages sustained because of the alleged nonfeasance and misfeasance of the defendant in the storage and use of water in the Wilson Stream Dam, so called, in the years 1917 and 1918.   The case was referred to two Justices of this court who found the facts and reported certain questions of law to the Law Court under Rule XLV.   By agreement of the parties the case was then reported to this court upon the questions of law reported by the referees and upon their findings of fact.

A summary of the general situation as determined by the referees may be briefly stated.   The plaintiff owns and operates a lumber mill on the Penobscot River at Hampden.   To obtain logs for its mill it was, in 1917 and 1918, carrying on lumbering operations on and near Wilson Stream in Piscataquis County.   Its operations amounted to

something more than two million feet each year, and Wilson Stream provided the only route for driving the lumber to Sebec Lake and thence to the Penobscot River. In the same years the defendant, as the successor of the original Wilson Stream Dam Company and also by virtue of divers special statutes to be hereafter referred to, owned and operated a dam and power station on said Wilson Stream and supplied power and light to various corporations and communities. The case involves the respective rights of the parties in the waters of Wilson Pond and Stream, the plaintiff requiring water for log driving and the defendant for power. Which, if either, has the priority in use is the main issue.

Wilson Pond with an area of about two square miles has a watershed of 43.2 square miles. From Wilson Pond, Wilson Stream flows approximately twenty miles to Sebec Lake. This lake is twelve miles long, and Sebec Stream, its outlet, which is about ten miles long, flows into the Piscataquis River, a branch of the Penobscot. The plaintiff's mill at Hampden is about one hundred and fifteen miles below Wilson Pond.

In order to facilitate the driving of logs and lumber down Wilson Stream, the Wilson Stream Dam Company was incorporated by Chapter 64 of the Private and Special Acts of 1899. This is one of a large number of similar charters granted by the Legislature of Maine from very early days to enable log owners and log drivers to more readily get their logs to market along streams which in their nature and condition are floatable for boats, rafts or logs and therefore navigable under the definition adopted in this State and, as such, are deemed public highways and subject to the use of the public. *Veazie* v. *Dwinel*, 50 Maine, 479; *Smart* v. *Lumber Co.*, 103 Maine, 37.

The sole purpose of this charter was to benefit the log owner and to assist him in getting his logs out of the stream in the Spring season. A storage dam for that single object was contemplated and provided for, in order that water might be stored in advance and then let out to increase the volume in the stream while the actual driving was in progress. Specified rates of toll were established by the Legislature and the right to charge tolls imposed the corresponding obligation to store and retain an adequate supply for driving purposes. The right and the duty were reciprocal. *Weld* v. *Proprietors of Side Booms*, 6 Maine, 93; *Lewiston Steam Mill Co.* v. *Richardson Lake Dam Co.*, 77 Maine, 337.

Section 4 of this charter provides as follows: "Said corporation shall not hold back and retain any of the water of said Wilson Stream, except during such times as may be necessary for driving logs and lumber, as provided for in this Act." This section emphasizes the fact that the dam or dams constructed under this charter were not to be working dams or reservoir dams to be used in connection with working dams, but simply storage dams for log driving purposes. For these purposes, however, the rights of the log owner under this charter were made paramount to the rights of all others. He was given the priority. The Legislature deemed it a matter of so great importance to the public that the products of our vast forests should be utilized that the policy was early adopted in this State to grant this class of charters and confer these paramount rights upon the log owners. To the natural right of passage was added the right on the part of the toll-paying log owner to enjoy and the duty on the part of the toll-receiving corporation to furnish the necessary accumulated and retained water for driving purposes.

After this charter of 1899 was granted a log dam was built by the company at the outlet of Wilson Pond. It was used exclusively for the chartered purpose. The gates were usually shut down in the Fall and the dam constantly had a good head of water at the beginning of the log-driving season in the Spring. This continued for ten years. During the year 1909, the Greenville Light and Power Company, which we shall hereafter refer to as the Greenville Company for the sake of convenience, built a new concrete dam 350 feet further down the stream than the log dam of 1899, its top being on a level with the top of the old dam and therefore superseding it. About a quarter of a mile below the concrete storage dam a diverting dam was constructed and water is taken from the diverting dam to the defendant's power station 90 feet lower vertically, through a steel penstock about 2,300 feet long. The power thus generated is distributed over a large territory. All this has been done under various charters to be considered later. No controversy arose over the respective rights of the parties until 1917, two years after the defendant came into possession. Up to that time, the log owners had encountered no trouble. But in 1917, owing to inadequate storage, the plaintiff suffered delay and expense although it finally got its logs to the Hampden mill. In 1918, the logs reached Sebec Lake but too late to go forward and join the main drive. Consequently they

were sold at Sebec Lake. The defendant's position is clearly stated in a letter to the plaintiff under date of January 11, 1918, in which it said: "We do not understand that we are under any obligation to store water in Wilson Pond for the benefit of the log driving." This is the sharp issue, and to consider it understandingly we must recur to the statutes amending the original charter.

By an amendment in 1901, Private and Special Laws 1901, Chapter 472, the Wilson Stream Dam Company was given the right to build and maintain additional dams for the same purposes. This does not affect the issue here.

In 1903 another amendment was obtained, Private and Special Laws, 1903, Chapter 48, by which in addition to the powers already conferred upon it, the corporation was further "authorized and empowered at all times to store and hold by means of the dams mentioned in said original charter and said amendment, water for all domestic, sanitary, manufacturing, industrial, municipal and commercial purposes, and to create power for any and all such purposes" and to "sell, lease or otherwise dispose of the use of said water for any and all such purposes or to create power for any and all such purposes to any person, party or corporation, municipal or otherwise."

This amendment greatly enlarged the powers of the corporation so far as the storage and use of the water was concerned. Instead of being confined to a dam or dams to be used only at a certain portion of the year and for the storage of water for the single purpose of aiding in the driving of logs, it took on the additional power to store and use water throughout the entire year and for all commercial and municipal purposes.

However, the grant was not without qualification and limitation. The underlying and primary purpose of the original charter was fully preserved and guarded by these significant words: "Provided however, the water stored in said dams shall be used at all times so far as necessary for log driving purposes on Wilson Stream." This proviso is of the utmost importance. It expresses the legislative intent that the prior and superior rights of the log owners must be kept intact, and it therefore of necessity continued to impose upon the corporation the corresponding duty to accumulate and store, as well as to discharge when stored, the requisite amount of water for driving purposes. That duty was neither abrogated nor diminished by the granting of the additional rights. The true interpretation of

this amendment of 1903 is this:  Under the act of 1899, when the driving season was over, the company could no longer retain the water in the dam and could use it for no other purpose.  The gates must be opened and the water flow in its natural volume.  Under the act of 1903, when the driving season was over the company could continue to store and hold the water during the remainder of the year and could use it for any commercial or municipal purpose. Certain rights and privileges were thereby added but no duties and obligations to log driving were thereby extinguished.  These additional rights were independent of and were secondary to the driving rights in case of a conflict between the two.

The defendant would construe this proviso to mean that when the log owner desires the water for driving purposes he shall have it so far as may be necessary if it happens to be in storage when desired for immediate use, but that the company is under no obligation to accumulate and store the water in advance for that purpose although seasonably notified by the log owner, as in this case, that it should expect it; in other words, that the respective rights have been virtually reversed, that the manufacturing rights have superseded the driving interests and have become primary, while the driving rights are secondary so far as accumulation and storage are concerned. This in practice amounts to a partial or total extinction of the log owners rights, because the corporation can easily manage to use all, or a large part, of the stored water before, or shortly before, the log driver should need it, and little or none would be left for him.

Such a construction makes the amendment of 1903 a repeal of the storage duty under the act of 1899 and places the log owner at the mercy of the corporation.  It is based upon the proposition that the Legislature had changed its long-time policy of utilizing the products of our wild lands in remote regions and applying the changed policy to the case at bar had deliberately and intentionally forsaken the owners of the forests adjacent to Wilson Pond and Wilson Stream. We cannot adopt such an interpretation.  A heavy burden rests on the party asking it, and that burden has not been met in this case. True, the language of this proviso is that the water "stored" in said dams shall be used at all times so far as necessary for log-driving purposes, and does not in express terms add the words "hold back and retain" which were employed in the act of 1899.  But in our opinion it was not the intention of the Legislature to modify or lessen

the duty of the corporation, and the word "store" in the amendment is equivalent as used here to "hold back and retain" as used in the original charter. If the obligation of the corporation is connected only with the use and not the storage, it would be as futile as to limit it to storage without use. The two must go together. They were created together and we do not think they have been sundered.

In consideration of storage and use, tolls were established in 1899, and they were not lessened by the act of 1903, although according to the defendant's contention the service to be rendered was minimized if not extinguished. Is it to be believed that the Legislature would have allowed the compensation to continue if the service was to be diminished?

Moreover, our construction is the one placed upon the amendment of 1903 by the parties themselves at the time of its passage and for fourteen years thereafter. This is most significant as bearing upon the intention of the corporation in asking for the amendment and of the Legislature in granting it.

Clearly there was no intention on the part of anyone at the time to modify the log-driving rights, but to give additional rights to the dam owner, and it is a well recognized rule of construction that statutes should be construed in a reasonable rather than in an unreasonable manner and so as to protect the rights of all rather than to sacrifice the rights of any.

The amendments subsequent to 1903 are in harmony with our views. Under Chapter 205 of the Private and Special Laws of 1905, the right to collect tolls was extended so as to cover all logs and pulp wood driven over the dams and improvements of the Wilson Stream Dam Company instead of being limited to those cut and hauled above the south line of Greenville as provided in the act of 1899. This shows that the Legislature still had in mind the rights and duties of the corporation as an aid to log driving.

In 1907, the Greenville Light and Power Company, previously incorporated under the general law, was confirmed in its incorporation and organization by Chapter 244 of the Private and Special Laws of that year, was authorized to extend its transmission lines, to supply the town of Greenville and Little Squaw Township with water taken from ponds and streams in said township, and was given the usual and necessary powers connected therewith and incidental thereto.

No mention whatever was made of the Wilson Stream Dam Company or the waters of Wilson Pond or Stream.

In 1907 the provision as to the tolls of the Wilson Stream Dam Company was again amended, Private and Special Laws 1907, Chapter 345.

In 1909 the Greenville Light and Power Company acquired the capital stock of the Wilson Stream Dam Company and by Chapter 95 of the Private and Special Laws of that year was further authorized to acquire all the property rights, privileges and franchises of that company and did so acquire them.

In 1915, the Penobscot Bay Electric Company acquired all the property rights, privileges and franchises of the Greenville Company, under Private and Special Acts of 1915, Chapter 52, and this corporation was the owner when these proceedings were begun.

Those franchises, acquired from the original company, first in 1909 by the Greenville Company and then in 1915 by the Penobscot Company, carried with them corresponding duties and all the obligations as to driving devolving upon the Wilson Stream Company before the mergers were assumed in the mergers and now rest upon the defendant. True, the duty of performing the obligations of the original rather insignificant corporation has in the course of time fallen upon a large and overshadowing corporation whose chief business is the creation and distribution of light and power over an extensive territory, and in which the desire has naturally arisen to enjoy the use of all the water in Wilson Pond and Stream at all seasons of the year unencumbered by the superior rights and privileges of the log owners; but the duty still remains in all its original force. It has run like a bright thread through the entire legislative fabric.

In our opinion, therefore, the plaintiff's rights in the case at bar are paramount to those of the defendant, and it was the duty of the defendant to accumulate and retain as well as to store and discharge an adequate supply of water for the plaintiff's use.

This brings us back to the report of the referees which finds as a fact that if the plaintiff's rights are paramount, the defendant both in 1917 and 1918 violated those rights. The report further says: "Neither in 1917 nor 1918, at the beginning of nor during the driving season was there stored by the defendant's dam an adequate head of water available for driving purposes. The defendant knew of the plaintiff's need of water for driving, seasonable notice having been

given and request made." This must be accepted as final. It might be added that under the changed conditions we think it reasonable to require the log owner to give to the dam owner seasonable notice of his need of the water, as was given here.

There is left for consideration only the question of damages.

## DAMAGES IN 1917.

The referees have settled this, as they have found that the damages sustained by the plaintiff in 1917, if liability is found on the part of the defendant, by reason of the defendant's failure to store and retain an adequate supply of water for driving purposes, was three thousand dollars. This finding is final.

## DAMAGES IN 1918.

This question involves two elements; first, the plaintiff's loss caused by delay and additional expense in driving due to an insufficient head. This the referees fixed at five thousand dollars.

The second element is the loss of manufacturing profits by reason of the failure to get the logs to the Hampden mill, and on this point the report says: "The whole question as to whether loss of profits is a proper element of damage in this case is reserved for the Law Court."

The allowance of profits in estimating damages in an action of tort of this nature depends upon the facts of each particular case. The legal rule, is that if the evidence shows the claim to rest upon a vague, uncertain and speculative basis, profits cannot be allowed. If, on the other hand, the loss of profits is proven to be the proximate result of the defendant's wrong and they can be shown with reasonable certainty then they can be recovered. They are in such case proven to be a part of the damage for which the plaintiff should be compensated. This is settled law. 8 R. C. L., 508.

In this case both these necessary elements are found by the referees as facts in their report. They say: "The plaintiff also claims that it suffered a loss of manufacturing profit to the extent of some $18,000 or $19,000 by reason of failure to get the logs to its Hampden Mill. But the plaintiff's claim is based upon an ex parte estimate of what would have happened under the most favorable conditions. We cannot base a judgment upon such an estimate without making large allowances. We have no doubt that the plaintiff if it had had an opportunity to manufacture these logs would have made a consider-

able profit in the operation.  In our judgment that profit may be properly fixed at twelve thousand dollars.  Damages in this behalf being additional to the amount allowed for the driving loss in 1918."

These findings leave no question of law open for the court.  Other facts and contentions are discussed in the report in this connection, but they in no way militate against nor affect the findings of the referees on this question, and we are therefore bound by the findings.

The conclusion, therefore, is that the defendant is liable for $3,000 damages in 1917, and $17,000 in 1918, and the mandate must be,

> *Judgment for plaintiff for $20,000 with interest from date of the writ and costs.*