RUDOLPH A. MICHALKA
*vs.*
GREAT NORTHERN PAPER COMPANY

Aroostook.   Opinion, July 21, 1955.

*Scott Brown,* for plaintiff.

*Louis C. Stearns,*
*Louis C. Stearns, 3rd,* for defendant.

SITTING: FELLOWS, C. J., WILLIAMSON, WEBBER, BELIVEAU, JJ. TAPLEY, J., did not sit.

FELLOWS, C. J. This case comes to the Law Court from Aroostook County Superior Court on exceptions by the defendant after jury verdict for the plaintiff.

The bill of exceptions states that "this was an action in negligence wherein it was alleged that defendant maintained and controlled a dam at the outlet of Mooseleuk Lake; that defendant negligently released impounded water from Mooseleuk Lake, thereby causing ice to be dislodged in Mooseleuk Stream and Aroostook River, thereby causing ice to jam adjacent to and below land of plaintiff in Oxbow Plantation approximately 30 miles from Mooseleuk Dam, thereby causing water and ice to overflow on land of the plaintiff, and thereby causing damage to the real and personal property of the plaintiff."

Exceptions were taken by the defendant company to the denial by the presiding justice of its motion for a directed verdict and three other exceptions relative to admissibility of a letter written by the Vice President of the company, and certain testimony.

The evidence, looked at in the plaintiff's favor, as is required of us after verdict, shows that the plaintiff, Rudolph A. Michalka was the riparian owner of a farm and buildings on the Aroostook River in Oxbow Plantation in Aroostook County. The defendant Great Northern Paper Company maintained a dam in Piscataquis County, thirty miles above

the plaintiff's farm at Mooseleuk Lake, and the water from this lake, together with the water from numerous other lakes and streams flowed into the outlet of Mooseleuk Lake known as Mooseleuk Stream, and thence approximately thirty miles through and across five or six unorganized townships of heavily wooded wildland to the Aroostook River, gathering in its course the water from many streams that run into it.

The record discloses that the supply of water in the Aroostook River above the plaintiff's farm is furnished by Munsungan Lake, Millinocket Lake, Millimagasett Lake, and Mooseleuk Lake. There was a dam at the outlet of Millinocket and Mooseleuk Lakes, the former being controlled by Maine Public Service Company and the latter by the defendant. There was no controlled flowage of the other outlets.

The dam maintained by the defendant at the outlet of Mooseleuk Lake thirty miles above, or northerly, of the plaintiff's farm, was about one hundred feet long and with the crib work about 150 feet. It had five gates with flash boards on one spillway. Four of the gates were eight feet six inches in height, and seven feet four inches in width. The spillway was two feet below the crest of the dam. This space of two feet was filled by flashboards. The dam created a head of water approximately eight feet, six inches in depth. The natural head before the dam was built was from two to three feet. Mooseleuk Lake before the dam was built was about a mile and a quarter long by one-half mile wide. Each of the four larger gates would discharge, if opened, 444 cubic feet of water per second. The drainage area of Mooseleuk Lake was ninety-nine square miles.

On March 31, 1953 after one of our severe winters of much cold and snow when many streams freeze deep, and after spring rains and the beginning of "spring break-up" in the locality, the plaintiff heard the rushing of water and

the breaking up of the ice in the river, and saw obstructions in the river caused by the piling up and jamming together of the ice cakes. The plaintiff testified that some of these ice cakes were from two feet to thirty inches thick, and varied in surface area from small cakes to twenty square feet, and one that he saw in particular "was a good sixty feet across." This ice piled up in the Aroostook River near and below the farm, and caused the water to be temporarily dammed up and overflow the plaintiff's property, causing severe damage to buildings, farm machinery, fertilizer, motor vehicles and other personal property.

On April 2, 1953 another flood occurred, piling up ice on the river bed, and floating large ice cakes onto the plaintiff's farm, and moving some small buildings from foundations and flooding his barn and bungalow. Two witnesses for the plaintiff, each more than seventy years old, testified that they had never seen the river at this point in such a flood condition.

There was no evidence offered by the plaintiff that any water in excess of the natural flow was released by the defendant at its dam. The letter written by William Hilton, the defendant's Vice President, who was manager of defendant's woodlands April 23, 1953, in response to a letter and a visit of the plaintiff to Mr. Hilton, offered by the plaintiff (subject to objection and exception) stated that "we have two dams which could effect the flow of the Aroostook River by your farm, namely, the Munsungen Dam and the Mooseleuk Dam. The Munsungen Dam gates have been wide open all the spring. The Mooseleuk gates—of which there are three—on March 26th the first gate was opened 5 feet and the flash boards taken off the spillway, and on March 31st the second gate was raised all the way up, and the third gate was not raised at all. They have remained in these positions ever since. Just one and one-half gates extra water, with the flood that you had on that river,

would hardly be noticed. I do not see where it could possibly be any fault of ours in handling the water that caused the big flow of ice and water that did occur in the Aroostook River.

According to the government measurements, the top flow of the river measured down around Washburn, which was considerably below your part of the country, was 30,000 second feet and the one and one-half gates up at Mooseleuk would add but little to the natural flood flow at that time."

The foregoing letter was the only bit of evidence to show what the defendant did with relation to the operation of its dam. The plaintiff in this regard depended on possibility and conjecture. There was no evidence of any negligent act. From anything that appears in the record, the opening of the gates as stated by Mr. Hilton would be only to care for the natural flow. There was no evidence of the release of impounded water, and on the contrary there is evidence that after the raising of the dam gates the height of the pond behind the dam increased. It did not diminish.

The plaintiff alleged in his declaration that the defendant: "prematurely opened the gates of said dam, well knowing that the ice in said Mooseleuk Stream and Aroostook River was fast and anchored, thereby releasing the abnormal head of water in said Mooseleuk Lake in enormous quantities," but there is not a scintilla of credible evidence to support this allegation. The plaintiff argues that because there was an unprecedented flood at this particular place on or near the plaintiff's farm on the Aroostook River, that his allegation must be so.

The plaintiff's evidence shows that there were five discharge gates in this dam, and his evidence indicates one and one-half gates had been opened, and only a small portion of the total discharge capacity of the dam. This water after passing the dam had to travel down Mooseleuk Stream

through an uninhabited and wooded area nineteen miles to join the Aroostook, some portion of this water would be normally and naturally absorbed and dispersed in the pools, back eddys and area of Mooseleuk Stream. After joining the Aroostook River it then had to travel eleven miles through uninhabited woodlands before it reached the plaintiff's land. The evidence indicates that Mooseleuk Dam is capable of holding a head of eight and one-half feet at the dam and the flowed lake approximates one square mile, and that by comparison this is a very small dam and a very small reservoir of water in a large watershed, and a small fraction of this small pond passed through the defendant's dam during this period of time. To defendant's knowledge there was no ice in Mooseleuk Stream to be disturbed or dislodged. The water had been running over the spillway of the dam all winter and defendant's agent could only reasonably anticipate that this water had followed the channel of Mooseleuk Stream and the Aroostook River as it normally should.

The record shows that the dam maintained at Mooseleuk Lake by the defendant company was authorized by legislative charter for log driving purposes. Its maintenance and operation for log driving purposes was lawful as against all lower riparian owners. Its use for log driving purposes necessarily involves the storage and discharge of water.

The owner of a dam is entitled to permit the natural flow to pass. This common law right is recognized by both counsel in their briefs. The lower riparian owner is entitled to the natural flow, unless of course a legislative charter authorizes otherwise. *Phillips* v. *Sherman,* 64 Me. 171, 174; *Pearson* v. *Rolfe,* 76 Me. 380; *Brooks* v. *Cedar Brook Co.,* 82 Me. 17; *Lumber Co.* v. *Electric Co.,* 121 Me. 287.

There must be negligence alleged and proved to make a defendant dam owner liable to a lower riparian proprietor,

and the defendant's negligence must be the proximate cause of the plaintiff's injury. "To render the defendant liable without negligence, his act must be shown to be wrongful as against the plaintiff." *Frye* v. *Moore,* 53 Me. 583 quoted in *Reynolds* v. *Hinman,* 145 Me. 343, 359.

Negligence consists in a failure to provide against the ordinary occurrences of life, and the fact that plaintiff's land was flowed by ice and water once in 66 years, as testified by plaintiff's witnesses, does not make out a case of negligence. Without knowledge of danger the duty to use ordinary care arises from probabilities rather than possibilities of danger. *Birmingham* v. *Railroad,* 128 Me. 264; *Edwards* v. *Power Co.,* 128 Me. 207; *Melanson* v. *Reed Bros.,* 146 Me. 16. See also 38 Am. Jur. 665, "Negligence," Secs. 23, 24.

In *Rockford Paper Mills* v. *Rockford,* 18 N. W. (2nd) 380 (Mich.) the plaintiff was owner of a dam on the Rogue River, which dam stored water for power purposes for making paper products. Defendant owned a dam two miles above on the same river. During a period of flood the defendant opened the gates and released water from its dam, but at no time while any of these gates were opened was there a material lowering of the water in the pond above the dam. The court held that the proprietors of the upper dam were not the insurers of the strength or stability of a lower dam and before they could be held responsible, there must have been negligence or some intention on their part to suddenly release impounded waters so that the damage on the lower dam would follow. They could not be held responsible for a superfluity of waters coming from a flood condition arising above their dam without any negligent act on their part. See also *Iodice* v. *State,* 102 N. Y. Supp. (2nd) 742.

A "scintilla of evidence" will not support a verdict. *Bernstein* v. *Carmichael,* 146 Me. 446; *Beaulieu* v. *Portland Co.,*

48 Me. 291; *Connor* v. *Giles,* 76 Me. 132; *Nason* v. *West,* 78 Me. 253.

The causal connection between defendant's acts of omission or commission, complained of, and the plaintiff's injury must not be left to conjecture or surmise. If the evidence leaves it uncertain as to the real cause of injury sympathy for his misfortune cannot supply necessary evidence. *Loring* v. *Railroad Co.,* 129 Me. 369.

The burden is upon the plaintiff to prove that the injury suffered by the plaintiff was the proximate result of acts by the defendant. It is a fundamental principle of law that in order to maintain an action for negligence, the injury of which the plaintiff complains must have been natural probable consequences of the wrongful act. The proximate cause of an injury is that cause which, in natural and continuous sequence, unbroken by an efficient intervening cause, produces the injury, and without which the result would not have occurred. The question of proximate cause is ordinarily for the jury, but where the evidence discloses no connection between the injury and the negligence charged, except a bare possibility that the former resulted from the latter, there is nothing for the jury, if it is also possible that the injury may be due to other causes.

In applying the general principles of proximate cause to this case, it is apparent from the evidence that the plaintiff's injury did not result from the defendant's discharging water from Mooseleuk Lake; it resulted from an entirely different cause. The appearance of an ice dam below the plaintiff's property was the efficient cause, and without the creation of this ice dam the water would not have overflowed the banks of the Aroostook River, and ice and water would not have been cast onto the plaintiff's property.

The plaintiff and the plaintiff's witnesses had never seen anything like it. The evidence, however, does not disclose

any connection between the release of water at Mooseleuk Lake and the formation of an ice jam in the Aroostook River more than thirty miles away. The jury's finding that the acts were connected is based entirely on speculation and sympathy, and not on evidence. There is no evidence as to how long a period of time it would take the water released at Mooseleuk Dam to reach the Oxbow flats where the damage occurred. The plaintiff's evidence establishes two rates of flow. The plaintiff's evidence indicates the first gate was raised March 26, and the ice jam appeared March 31—five days later—in the vicinity of the plaintiff's property. If this first released water had any connection with the ice jam, the water used five days to move thirty miles, an average of one quarter of a mile an hour. The plaintiff's evidence indicates that the ice jam and water overflow increased substantially on April 2 and the second gate of the dam was raised March 31. This time the ice and water moved the same thirty miles and consumed three days. In either situation the rate of flow is incredibly slow. From this evidence it is obvious that the ice jam and overflow was caused by the seasonal mild weather and the natural movement of ice and water in the entire Aroostook River water shed with its many streams, and the water coming from Mooseleuk Lake was only one of the natural conditions.

In the instant case the small amount of water that the evidence indicates passed through Mooseleuk Dam, could not materially increase the volume of water and ice at Oxbow flats thirty miles below, and thus it is a situation where the court may say with almost certainty that the injury suffered by the plaintiff was not the natural and probable consequence of any acts (whatever they were) committed by this defendant's agents.

The defendant's motion that a verdict be directed for the defendant should have been granted because the defendant may rightfully permit water to pass over or through its dam

in such quantities as the water is flowing into Mooseleuk Lake, and the plaintiff failed to show that impounded water was released. On the contrary, the evidence clearly shows that the defendant impounded and restrained a portion of the natural flow coming into Mooseleuk Lake. Also the evidence does not support negligence by the defendant, for no reasonable man could have foreseen that the release of water through Mooseleuk Dam would cause this damage to any person or property 30 miles below. The evidence produced is so slight that it can be considered only a scintilla of evidence and not sufficient to support a verdict for the plaintiff. Further, the defendant's alleged negligence was not the proximate cause of the plaintiff's damage, and his injury resulted from other causes in which the defendant in no part contributed and over which the defendant had no control.

The exception to the refusal to direct a verdict must be sustained. It is therefore unnecessary to consider the other exceptions.

The entry will be

*Exceptions sustained.*