**Robert C. WALTERS, d/b/a
Walters Enterprises**

v.

**PETROLANE–NORTHEAST GAS
SERVICE, INC.**

Supreme Judicial Court of Maine.

Argued Sept. 15, 1980.

Decided Feb. 4, 1981.

GLASSMAN, Justice.

This appeal by a supplier of liquefied petroleum gas arises out of a negligence action for property damage which was tried before a jury in the Superior Court, Aroostook County. Judgment was entered for the plaintiff, Robert C. Walters, d/b/a/ Walters Enterprises, against the defendant, Petrolane-Northeast Gas Service, Inc. Petrolane urges three points on appeal. First, a new trial should be granted on the question of liability because of the trial court's refusal to give requested jury instructions. Second, the jury's award of lost profits was based on mere speculation. Third, the overall damages were excessive as a matter of law. We affirm the judgment of the Superior Court.

Walters is a resident of Presque Isle who, at the time this action began, was sole proprietor of a metal fabrication business, Walters Enterprises. His shop, where the bulk of his business was carried on, was located in a converted barn adjoining his house. On February 14, 1977, the house, barn, furnishings and metal fabrication machines were totally destroyed by fire. It was undisputed that the fire was caused by liquefied petroleum gas leaking from a 500-gallon tank in Walters' front yard. The tank was owned and serviced by Petrolane.

Walters began dealing with the defendant in 1970 when Roger Dunn, Petrolane's manager in the Presque Isle area, installed in Walters' yard a 120-gallon liquefied petroleum gas tank. The 120-gallon tank was used to feed appliances in Walters' home, and it remained in service until the 1977 fire.

Late in 1975, Walters purchased a large furnace to heat the work area of the barn. To fuel that furnace, he acquired from Dunn the 500-gallon tank. The plaintiff himself picked up, transported and placed the 500-gallon tank next to the 120-gallon tank. Subsequently, Dunn drove to Walters' residence and connected to the large tank the copper tubing which Walters had already connected to the shop furnace. Dunn testified that he knew the large tank's location violated state regulations.

John C. Walker, Phillips, Olore & Walker, P.A., Presque Isle, for plaintiff.

Bither & Goodwin, Thomas L. Goodwin, Houlton (orally), for defendant.

Before McKUSICK, C. J., and WERNICK, GODFREY, NICHOLS, GLASSMAN and ROBERTS, JJ.

Walters was unaware of the violation. Inches away from the smaller tank and only a few feet from both the barn and the house, the large tank's placement posed the risk that if a leak should occur the gas would not dissipate before being trapped in the buildings. Although at some later time Dunn mentioned this "poor location," the 500-gallon tank went into and remained in operation where it stood.

Slightly over a year later, on February 14, 1977, an employee of Walters struck the large tank with a front-end loader while plowing snow. The tank's valve was sheared, gas leaked into the buildings and the house burst into flames. After the Presque Isle Fire Department had extinguished the fire and returned to its station, more flames burst out in the barn. The two buildings then burned to the ground.

In the suit that followed, a jury determined that Walters and Petrolane were both causally negligent but that Petrolane's responsibility was greater. Having found Walters' total damages to be $167,000 including loss of profits of $10,000, the jury accordingly awarded Walters $100,200.

### I.

The first issue raised in this appeal concerns the trial court's failure to give Petrolane's requested instruction on the meaning of applicable regulations. The parties had stipulated that for all times relevant to this action the State's regulations governing the storage and handling of liquefied petroleum gas were contained in so-called "Pamphlet 58," a booklet drafted under the auspices of the National Fire Protection Association. *See* 25 M.R.S.A. § 2441.

Table 3–1 of Pamphlet 58 sets forth the minimum distances from buildings at which liquefied petroleum gas tanks can safely be placed. The location of the 500-gallon tank undisputedly violated the regulations in Table 3–1. How far from the buildings the tank should have been placed, however, was never resolved at trial. Roger Dunn, the employee of Petrolane responsible for properly locating the 500-gallon tank, testified that he understood Table 3–1 to mean that

the tank should have been placed a minimum of ten feet away from the buildings. Robert McMahan, the State Fire Inspector, and Robert Soucier, district manager of a competing liquefied petroleum gas company, both testified that they understood Table 3–1 to mean that the tank should have been placed at least twenty-five feet away from the buildings. No other witness addressed the question.

■ Petrolane requested the trial court to instruct the jury that the regulations required a ten-foot minimum distance; over timely objection, the trial court refused. Rather than informing the jury how far from the buildings the regulations required the tank to be, the trial court instructed as follows:

> Now, that [filling a 500-gallon tank whose proximity to the buildings violated Maine regulations] doesn't end it because you must also find that the violation of law was ... a proximate cause of what happened. On the question of whether or not the 500 gallon tank should have been 10 or 25 feet away, depending on how you view the evidence on the whole case, that's up to you. ... All I can do is to ask you to read the regulations [Table 3–1] on the equipment because you can decide whether that multiplies to 25 feet or not as well as I have. You heard the witnesses with expertise and you'll have to decide.

We agree with Petrolane that in failing in its charge to interpret the regulations for the jury, the trial court failed to fulfill its duty to instruct on applicable law. 14 M.R.S.A. § 1105. We do not agree, however, that in this instance the court's error was reversible.

In arguing to the contrary, Petrolane contends that the error subverted all proof of "proximate" or "legal" causation. Opinion evidence was clear that the explosion would not have occurred had the tank been located a minimum of twenty-five feet from the buildings. But the only evidence as to whether an explosion would have occurred had the tank been located ten feet

from the buildings was elicited from Robert Soucier who, in response to a question from the bench, answered as follows:

COURT: I'll ask you one question, if I may. We have had a lot of witnesses testify. Did you testify that had that 500 gallon tank been 25 feet away, that there would not have been an explosion? Did you say that or didn't you?

WITNESS: I don't believe there would have been, Your Honor, no.

COURT: How about 10 feet?

WITNESS: It's possible the gas could have got into the house.

COURT: It's possible but you wouldn't say that it would? The testimony is, to make it brief, in your opinion if it was 25 feet away, the explosion would not have occurred in all likelihood.

WITNESS: I don't believe it would.

COURT: But if 10 feet away, it might?

WITNESS: It might.

Relying on Soucier's testimony, Petrolane argues that if the jury had been instructed that the regulations required a minimum distance of only ten feet it could have found that compliance with the regulations would not have avoided the injury. *A fortiori* the jury then would have found that Petrolane's noncompliance with the regulations was not the proximate cause of the injury. *See, e. g., Rouleau v. Blotner*, 84 N.H. 539, 152 A. 916 (1931); *see generally* W. Prosser, *Handbook of the Law of Torts* 238 (4th ed. 1971).

As we have no way of knowing what acts or omissions of Petrolane the jury found caused the injury, we must assume, *arguendo*, that the jury believed the tank's prox-

imity to the buildings to be the only cause of the injury for which Petrolane could be held liable.[1] Since in legal contemplation the negligent placement and filling of the tank cannot be regarded as having caused the explosion unless the non-negligent placement and filling of the tank would have avoided the explosion, we must also assume the jury found that Walters would have escaped injury had Petrolane complied with the standards in Table 3–1.

■ Our examination of Table 3–1 has satisfied us that the trial court should have instructed the jury that the 500-gallon tank was required to be not a minimum of ten, but a minimum of twenty-five, feet from the buildings. The court's error in allowing the opportunity for misinterpretation is, therefore, harmless. It is true that under the court's instructions the jury may have misinterpreted Table 3–1 as requiring a ten-foot rather than a twenty-five-foot minimum distance; but because the evidence showed the injury "might" have occurred at ten feet but almost certainly would not have occurred at twenty-five feet, Petrolane was not prejudiced by the instruction. On the contrary, the instruction was more favorable to Petrolane than a correct instruction would have been.

How far from the buildings the 500-gallon tank should have been placed turns on the meaning of two footnotes in Table 3–1. We have determined that the mandatory minimum distance was twenty-five feet because in the language of Table 3–1 the 500 gallon tank was part of a "multi-container installation" rather than a "single container"; its location is therefore controlled by

1. The plaintiff argues that the jury could have found proximate cause in one or more of many *prima facie* negligent acts. Therefore, he maintains, the error in instructions is harmless. Acting through its employee, the defendant failed, for instance, to clasp down the hood that covered the tank's valve, thus rendering it more likely that the valve could be accidentally sheared when struck by a snowplow. The defendant failed to erect barricades around the tank. The defendant failed to instruct Mrs. Walters to shut off all sources of ignition in the house once the gas leak was discovered. These and other failures cited in the plaintiff's brief are amply supported by the record. Standing alone or in combination, they might have been determined by the jury to constitute the proximate cause of the injury.

The problem with the plaintiff's approach is that we have no way of ascertaining where, in fact, the jury did find proximate cause. It is true that the jury apparently *need not* have found proximate cause *only* in the negligent location of the 500-gallon tank. Nevertheless, the jury *may* have done just that; to assume that it did not, or to declare that it need not, would risk substituting our judgment for the judgment of the jury.

footnote (a) as opposed to footnote (c) of the table. Footnote (a), which stands under the line pertaining to containers of less than 125 gallons water capacity, declares:

> If the aggregate water capacity of a *multi-container installation* at a consumer site is 501 gallons or more, the minimum distance shall comply with the appropriate portion of this table, applying the aggregate capacity rather than the capacity per container .... National Fire Protection Association, *Standard for the Storage and Handling of Liquefied Petroleum Gases* 58–43 (1972) (emphasis added).

Since the aggregate capacity of the 120-gallon and the 500-gallon tanks was 620 gallons, the appropriate portion of the table is the fourth line, which pertains to containers with a water capacity of 501–2000 gallons. The fourth line specifies a minimum distance of twenty-five feet from the buildings. Under the fourth line stands footnote (c), which states:

> This distance may be reduced to not less than 10 feet for a *single container* of 1,200 gallons water capacity or less provided such container is at least 25 feet from any other LP–Gas container of more than 125 gallons water capacity. *Id.* (emphasis added).

In requesting an instruction that the regulations required the 500-gallon tank to be not less than ten feet from the buildings, Petrolane relied exclusively on footnote (c). Not expressly, but by necessary implication, Petrolane asserts that the 500-gallon tank was a "single container," not part of a "multi-container installation."

■ Nowhere does Pamphlet 58 define "multi-container installation." We conclude the term applies to the facts of the instant case for three reasons. First, and most obviously, *two* tanks were installed next to one another in front of the plaintiff's buildings. Second, like Robert Soucier, the district manager of a gas company in competition with Petrolane, Robert McMahan, the State Fire Inspector, clearly implied that he regarded the 500-gallon tank as part of a multi-container installation:

> [Mr. McMahan]: Based on water gallons, capacity of water gallons, the 500 gallon water capacity tank calls for 10 feet but when there are two tanks at the location, you add the capacity of the second tank and add that to the first, and you come up with 620 gallons and on Table 3–1, in Pamphlet 58, it tells you they must be 25 feet from the building. The idea of them being 25 feet from the building is in the event of an incident or accident that the rapid vaporization of liquified [sic] petroleum gas will dissipate under test conditions before it reaches the facility. This is where we come up with the distance criteria.
>
> [Mr. Walker]: So in determining the 25 feet, you would have to add the water capacity of the ... 120 plus the capacity of the 500 gallon tank together?
>
> [Mr. McMahan]: Correct.

Constituting an interpretation of a technical regulation by an official of the State administrative agency which promulgated the regulations, Mr. McMahan's testimony is entitled to great weight.[2] *See Snider v.*

2. We note the following passage from cross-examination of Mr. McMahan which arguably raises some question about the nature of a multi-container installation:

> [Mr. Goodwin]: Is it common to hook together small tanks?
> [Mr. McMahan]: The multi-tank installation?
> [Mr. Goodwin]: Yes.
> [Mr. McMahan]: Yes, it's done.
> [Mr. Goodwin]: In a multi-tank situation the tanks are hooked together?
> [Mr. McMahan]: Right.

While we can find no direct evidence in the record one way or the other, circumstantial evidence suggests that the 500-gallon tank was not "hooked together" with the 120-gallon tank. The passage is ambiguous, however. Instead of meaning that the tanks of all multi-container installations must be "hooked together," it may reasonably be read to mean that only multi-container installations involving "small tanks" require hooking together. Because of this ambiguity, the deference we have given to Mr. McMahan's interpretation of Table 3 1 might not have been affected *even if* the defendant had chosen to bolster its position by alluding to the above-quoted passage.

District of Columbia Board of Appeals and Review, 342 A.2d 50 (D.C.1975). *Cf. Kelley v. Halperin*, Me., 390 A.2d 1078 (1978) (administrative agent's interpretation of a statute entitled to deference).

Finally, we conclude this case involves a multi-container installation because we thereby avoid an unreasonable or absurd result. *See, e. g., Woodcock v. Atlass*, Me., 393 A.2d 167, 170 (1978). The regulation here involved has as its purpose safety—the reduction or elimination of dangers from the installation and use of liquefied gas systems. The testimony is clear that if the regulation is interpreted to require placement of these tanks twenty-five feet from the buildings in case of accident the distance would allow dissipation of the vapors before they reached the buildings, thereby avoiding the explosion. On the other hand, if the regulation is interpreted to require only ten feet, in case of accident the distance might not be sufficient to dissipate the vapors and an explosion might result. Under these circumstances, it would be irrational to construe the regulation as permitting the shorter distance. We construe the regulation so as to achieve its purpose. That purpose can be achieved only if the regulation is construed as requiring the twenty-five-foot distance.

## II.

The second issue raised in this appeal concerns the jury's award of $10,000 for lost profits. There was no dispute that the shop, inventory, tools and machines of Walters' metal fabrication business were totally destroyed in the February, 1977, fire. Business records were not broken down by "department," but uncontradicted testimony established that immediately prior to the fire over three quarters of Walters' income had been derived from metal fabrication. Other income was earned through construction work with heavy equipment such as

backhoes. Immediately following the fire, Walters began gradually to rebuild his metal fabrication business, but during the rest of 1977 the ratio between income derived from metal fabrication and that from construction work was reversed.

Walters had been engaged in metal fabrication for at least three years preceding the fire. According to his accountant, the business was growing. Gross income from all of Walters' enterprises in 1974 was $67,834; the net profit was $8,137. In 1975, gross income was $71,531; the net profit was $4,803. (The 1974–75 dip in net profit was described by Walters' accountant as not unusual in a growing business because start-up costs of different aspects of a venture can temporarily absorb what might otherwise appear as profit.) In 1976, the year preceding the fire, gross income had increased to $117,303 and net profit to $19,-490. Claiming that these figures provide no mathematical basis for ascertaining lost profit, Petrolane maintains that the jury's award of $10,000 should be set aside because it is purely speculative. We disagree.

■ When, as here, there is ample, uncontradicted evidence that a business was established, growing and consistently profitable prior to injury; when the record warrants the conclusion that profit was lost as a proximate result of the defendant's negligence and the only matter for determination is, inevitably, how much profit; and when the fact finder's estimate of lost profit reasonably reflects the testimony and data presented at trial,[3] insistence on additional "certainty" is simply out of place. As the Supreme Court noted in *Palmer v. Connecticut Railway & Lighting Co.*, "[t]he wrongdoer should not be mulcted, neither should he be permitted to escape under cover of a demand for nonexistent certainty." 311 U.S. 544, 560–61, 61 S.Ct. 379, 384–385, 85 L.Ed. 336 (1941). *See Doane v.*

**3.** We note that the jury rejected the lost profit estimate of the plaintiff's accountant. *Cf. Sterns Lumber Co. v. Penobscot Bay Elec. Co.,* 121 Me. 287, 116 A. 734 (1922) (sustaining award made by referees who similarly rejected the lost profit estimate of Sterns). The ac-

countant's estimate, $41,468, was derived by adding the plaintiff's 1977 business losses to the profit earned in 1976, the accountant having made the assumption that without the fire the plaintiff's 1977 profits would have been the same as the 1976 profit.

*Pine State Volkswagen, Inc.*, Me., 377 A.2d 481, 485 (1977). Contrary to the suggestion of Petrolane, nothing we said in *Ginn v. Penobscot Co.*, Me., 334 A.2d 874 (1975), contradicts our position in the case at bar.

## III.

After the jury returned a verdict assessing damages of $10,000 for lost profits and $157,000 for destruction of property, Petrolane moved for an order of remittitur or for a new trial on the issue of damages. Declaring that the finding of property damage was based upon evidence of value which was "picked out of the air" by Walters and his wife, Petrolane contends the damages are excessive as a matter of law.

■ Property owners, by reason of their ownership alone, may state their opinion as to the fair market value of their property. *Simmons v. State*, Me., 234 A.2d 330, 332 (1967). Mr. and Mrs. Walters did so testify.[4] During the three to four months following the fire, Mrs. Walters compiled a list of the personal property destroyed within the home, estimating a value for each item enumerated. A similar list of the inventory, capital equipment and tools destroyed within the metal fabrication shop was prepared through the joint effort of Mr. Walters and Merrill Clark, a long-standing employee and user of the tools and equipment. Basing their testimony on these efforts, Walters and his wife opined that at the time of their destruction the fair market value of both the home and its personalty was about $50,000; Walters also testified that he estimated the fair market value of the metal fabrication building, tools, inventory and equipment to be about $106,000–$108,000. The jury obviously relied on this testimony.

■ From evidence that Walters had earlier contributed to another list that estimated the total fair market value of all property lost to be $61,064, Petrolane charges that

the estimates to which Mr. and Mrs. Walters testified at trial were unjustifiably inflated. The $61,064 estimate was apparently made barely a month after the fire; it was intended for use in the deduction of tax losses and originated in meetings with Walters' accountant. Allegedly believing that the tax list need not be complete because the losses suffered exceeded the amount that could be deducted, Mrs. Walters testified that she gave little thought to her initial approximations of fair market value. The jury could infer that the same held true for Mr. Walters. According to Petrolane, however, only the tax list can be trusted because that list alone represents a spontaneous and objective assessment of damage made when the possibility of a substantial jury verdict was comparatively remote from Walters' contemplation.

■ The jury had the testimony concerning the tax list and that concerning subsequent estimates of value before it. The testimony of Mr. and Mrs. Walters was, if believed, sufficient to support the award. Essentially, Petrolane's argument is that the jury should not have believed Mr. and Mrs. Walters because of the earlier inconsistent evaluation prepared for income tax purposes. Although the jury might have chosen to disbelieve Mr. and Mrs. Walters, the acceptance of their testimony was not irrational in light of the reasons given for the inconsistency, the description of the property destroyed and the explanation of their current opinions as to value.

> This Court will not substitute its judgment for that of the jury and will not disturb the damage award unless it is the product of bias, prejudice, improper influence, or was reached under a mistake of law or in disregard of the facts. *S.H. Nevers Corp. v. Husky Hydraulics, Inc.*, Me., 408 A.2d 676, 681 (1979).

There is no reason to disturb this jury award.[5]

---

4. Mrs. Walters was permitted to offer her opinion as to value. Petrolane does not object to the admissibility of her testimony, characterizing her as "a co-owner." Petrolane has not

suggested any nonjoinder. *See* M.R.Civ.P. 19(a).

5. In a footnote to its brief, the defendant suggests the verdict can be "explained" as a reflec-

The entry is:
Judgment affirmed.

All concurring.

tion of prejudice against a large, out-of-state petroleum company. The record before us

does not support the assertion of jury prejudice.