**STATE of Maine**

v.

**Vinal R. CROCKER.**

Supreme Judicial Court of Maine.

Argued April 1, 1981.

Decided Sept. 18, 1981.

William R. Stokes (orally), Charles K. Leadbetter, Michael E. Saucier, Linda S. Crawford, Asst. Attys. Gen., Augusta, for plaintiff.

Paine & Lynch, Martha J. Harris (orally), Bangor, for defendant.

Before McKUSICK, C. J., and WERNICK *, GODFREY, NICHOLS, GLASSMAN ** and CARTER, JJ.

McKUSICK, Chief Justice.

A Penobscot County jury found defendant Vinal Crocker guilty of murder, 17–A M.R.S.A. § 201 (Supp. 1980), in connection with the death of his five-year-old stepson, Timothy. On his appeal, defendant raises numerous claims of error. We affirm his conviction.

---

\* Wernick, J., sat at oral argument and participated in the initial conference but retired before this opinion was adopted.

\*\* Glassman, J., sat at oral argument and participated in the initial conference, but died before this opinion was adopted.

## FACTS

On Friday evening, November 24, 1978, five-year-old Timothy Crocker was brought by his mother, Martha Crocker, to the emergency room of St. Joseph's Hospital in Bangor. At the time, Timothy ·was comatose, having suffered an injury to the right side of his head, resulting in severe brain damage. That entire side of his head was covered with bruises. Both eyes were deeply bruised, as was much of his body. There were also various scrapes, abrasions, and burn marks on his body. His heels and other parts of his body had pressure sores, apparently resulting from his having been bedridden without attention for an extended time. He was also severely malnourished and dehydrated, conditions consistent only with a lengthy period of food deprivation and with water deprivation for several days.

Later the same evening of Friday, November 24, Timothy was transferred to Eastern Maine Medical Center, also in Bangor. He never regained consciousness, and died there on December 5, 1978. At the time of his death, he weighed only 31 pounds, about three quarters the normal weight for a child his age. An autopsy established that the cause of death was a combination of starvation and the head injury.

In a two-count indictment, defendant was charged with murder, and his wife Martha with manslaughter.[1] Defendant, who had already been arrested and committed to Bangor Mental Health Institute, was evaluated by six psychologists and psychiatrists and found competent to stand trial. He elected to undergo a bifurcated trial as permitted by 17–A M.R.S.A. § 59. In the first half of that trial, a jury found him guilty of murder. In the second half, the presiding justice sitting without a jury ruled that defendant had failed to sustain his burden of proving that he lacked criminal responsibility within the meaning of 17–A M.R.S.A. § 58(1). After denial of his motion for a new trial, defendant appealed to this court.

## I. The Challenges to the "Depraved Indifference" Murder Statute, 17–A M.R.S.A. § 201(1)(B).

■ Defendant was charged, in a single-count indictment, with two alternative forms of murder: (i) intentional or knowing killing under paragraph A of 17–A M.R.S.A. § 201(1), and (ii) "depraved indifference" killing under paragraph B of that section.· Section 201(1)(B) provides that a person is guilty of murder if:

> He engages in conduct which manifests a depraved indifference to the value of human life and which in fact causes the death of another human being.

On appeal, defendant asserts that the term "depraved indifference" used in paragraph B of section 201(1) is unconstitutionally vague and that his conviction obtained under an indictment alleging a depraved indifference killing therefore deprived him of due process.[2] Nothing in the record shows that this issue was raised in the trial court; accordingly, even though it purports to be of constitutional dimension, we review it only for "obvious error affecting substantial rights." *State v. Flick*, Me., 425 A.2d 167, 174 (1981); M.R.Crim.P. 52(b).

---

1. On defendant's motion the Superior Court severed his trial from that of Martha Crocker. In a separate proceeding, Martha Crocker was convicted on the charge of manslaughter. The Law Court sustained her appeal from that conviction. *State v. Crocker*, Me., 431 A.2d 1323 (1981).

2. In his discussion of a separate issue in his brief, defendant asserts that this court should conclude that he was in fact convicted of depraved indifference murder on the basis of the closeness in time of the jury's return to the courtroom for reinstruction on the issues of depraved indifference and criminal negligence and the subsequent rendition, one half hour later, of their verdict of guilty of murder. Aside from the fact that we need not in any event decide that question, since the point here at issue is whether defendant could have been improperly convicted and not whether he was in fact improperly convicted, nothing in the record would justify our drawing any conclusions about the jury deliberations in the interval between the reinstruction of the jury and the return of the verdict.

As we understand defendant's claim on appeal, the issue of whether the depraved indifference portion of the murder statute is unconstitutionally vague raises two separate questions. The first question, to which defendant adverted for the first time in his appellate brief, is whether a " 'person of ordinary intelligence' could . . . 'reasonably understand' that [the depraved indifference murder statute] forbids the conduct for which he is criminally charged," *State v. Parker*, Me., 372 A.2d 570, 573 (1977), *citing and quoting United States v. Harriss*, 347 U.S. 612, 617, 74 S.Ct. 808, 811, 98 L.Ed. 989 (1954). We recently answered that very question in *State v. Flick, supra*. There we held that section 201(1)(B) did not fall so far short of the standard articulated in *State v. Parker, supra*, as to have deprived the defendant of a fair trial. The holding in *State v. Flick, supra*, squarely controls our resolution of this first question.

The second question raised as a result of defendant's attack on the constitutionality of the depraved indifference murder statute, also not timely preserved for appellate review, was not before this court in *State v. Flick*. Under our Criminal Code, both depraved indifference murder and the lesser-included offense of criminal negligence manslaughter, *cf. State v. Goodall*, Me., 407 A.2d 268, 280 n. 17 (1979), consist of 1) the causation by the accused of the death of another human being and 2) the presence of some objectively measured standard of criminal culpability derived from the circumstances surrounding the victim's death.[3] The position advanced on behalf of defendant at oral argument was that the depraved indifference murder statute requires no greater quantum of proof to secure a conviction than does the criminal negligence manslaughter statute. According to that viewpoint, the two offenses, purportedly different and carry penalties of different severity, *compare* 17–A M.R.S.A. § 1251 *with id.* §§ 203(3), 1252(2)(A), are in reality the same; and any murder conviction that

might be founded on the depraved indifference portion of the statute is arbitrary and thus invalid.

We start from the fundamental precepts that courts will, if possible, "construe legislative enactments so as to avoid a danger of unconstitutionality" and that that the central purpose of statutory construction is "to save, not to destroy." *State v. Davenport*, Me., 326 A.2d 1, 5–6 (1974). In order to determine whether depraved indifference and criminal negligence are in fact one and the same, we must first examine the respective definitions of each of those terms.

The term "depraved indifference to the value of human life" as employed in 17–A M.R.S.A. § 201(1)(B) is nowhere defined in the Criminal Code. However, this court has on several recent occasions construed the depraved indifference murder statute, and our constructions "become a part of the statute as definitely as if the Legislature itself had amended the statute to reflect expressly the judicial construction," *State v. Davenport, supra* at 6. As we have consistently said, a verdict of guilty of depraved indifference murder is appropriate where the accused's conduct, "objectively viewed, created such a high tendency to produce death that the law attributes to him the highest degree of blameworthiness." *State v. Lagasse*, Me., 410 A.2d 537, 540 (1980). Put differently, death-producing conduct will justify a verdict of guilty of depraved indifference murder if a jury could find that that conduct was "so heinous in the eyes of the law as to constitute murder." *State v. Woodbury*, Me., 403 A.2d 1166, 1173 (1979). The accused must consciously have engaged in conduct that he should have known would create a "very high degree" of risk of death or serious bodily injury and "it must also under the circumstances [have been] unjustifiable for him to take the risk." W. LaFave & A. Scott, Jr., *Criminal Law* § 70 at 542 (1972).

---

3. The depraved indifference murder and criminal negligence manslaughter statutes depart from the ordinary practice in assigning criminal responsibility in that they permit a finding of guilt without any showing of a subjective state of mind on the part of the actor. *See State v. Lagasse*, Me., 410 A.2d 537, 540 (1980); *State v. Goodall*, Me., 407 A.2d 268, 279–80 (1979).

When the legislature added the charge of depraved indifference murder to the Criminal Code as part of its 1977 revision of the homicide laws, P.L. 1977, ch. 510, §§ 38–43, it returned from the 1976 Code's six degrees of homicide—which provided for conviction for murder only of persons who were shown to have killed another human being with the requisite subjective state of mind, *see* 17–A M.R.S.A. §§ 201–206 (Supp. 1976)—to the pre-Code law of murder and manslaughter. *See State v. Woodbury, supra* at 1173. In enacting the depraved indifference murder statute as part of its return to the earlier classification of homicides, *see* 1977 Me. Leg. Rec. 2257 (remarks of Rep. Spencer), the legislature among other things reinstated the objective standard of culpability that governed the pre-Code offense of "implied malice" murder. Under that pre-Code standard, a jury's finding that the accused had engaged in conduct *objectively* manifesting a high tendency to cause death had sufficed to sustain a conviction for murder. *See, e. g., State v. Lewisohn*, Me., 379 A.2d 1192, 1207 (1977). Under the new statute, "conduct [manifesting] a depraved indifference to the value of human life and . . . in fact [causing] the death of another human being" was punishable as murder. This court's consistent interpretations, for more than a century, of the former law relating to the objective standard of implied malice thus aid us in interpreting the present Code's standard of depraved indifference.

Prior to the 1975 enactment of the Criminal Code, the former murder statute, 17 M.R.S.A. § 2651 (1965), provided that

Whoever unlawfully kills a human being with malice aforethought, either express or implied, is guilty of murder . . . .

That statute and its predecessors incorporated in turn the common law of murder, *cf. State v. Conley*, 39 Me. 78, 87 (1854). Both at common law and under the statutes, malice was implied "from any deliberate, cruel act, committed by one person against another, suddenly, without any, or without a considerable provocation." *State v. Neal*, 37 Me. 468, 470 (1854).

This court recently has said that malice aforethought "is implied when there is no showing of actual intent to kill, but death is caused by acts which the law regards as manifesting such an abandoned state of mind as to be equivalent to a purpose to murder." *State v. Park*, 159 Me. 328, 332, 193 A.2d 1, 3 (1963) (implied malice present when defendant stabbed over 40 times with a jackknife a girl whom he had bumped into and who had then called him "a queer"), *citing and quoting State v. Merry*, 136 Me. 243, 248, 8 A.2d 143, 146 (1939). Still more recently, this court stated that a finding that the accused had engaged in objectively "reckless" [4] or "brutal" conduct causing a death and manifesting a "heart void of social duty, and fatally bent on mischief," *State v. Lafferty*, Me., 309 A.2d 647, 671, 672 n. 5 (1973), would sustain a jury verdict of guilty of murder. *See also State v Woodbury, supra* at 1173.

Finally, in further explicating the nature of conduct objectively manifesting a high death-producing potential, this court, in *State v. Ellis*, Me., 325 A.2d 772, 776 n. 2 (1974), observed that even though that conduct "necessarily involves neither a subjective intention to kill nor a subjective awareness of the serious danger to which others are exposed, . . . it is regarded in law as such a serious disregard of the obligation to exercise reasonable care so as not to unreasonably endanger the lives and safety of others as to be tantamount to a subjective intention to kill and deserving the same punishment." *See also State v. Lewisohn, supra* at 1207–08. That standard, well-es-

---

4. The objective "reckless" conduct element of implied malice murder was "quite different in quality" from the subjective "reckless disregard for the lives or safety of others" upon a finding of which a jury under pre-Code law could return a manslaughter verdict. Pre-Code discussions of implied malice murder employed "reckless" as a shorthand for the objective description of conduct considered by law to be equivalent to a subjective intention to kill. *See State v. Ellis*, Me., 325 A.2d 772, 776 n. 2 (1974); *see also State v. Lewisohn*, Me., 379 A.2d 1192, 1215 (1977) (Pomeroy, J., dissenting); *State v. Lafferty*, Me., 309 A.2d 647, 671, 672 n. 5 (1973).

tablished in the common law of murder and by this court's century-long interpretations of the statutory replacements, is completely consistent with our reading of the present "depraved indifference" murder statute, enacted by the legislature as part of a return in general to the former homicide law framework. Under both standards, a jury would be permitted, and indeed required, to determine that an accused was guilty of murder whenever his conduct resulting in death was particularly outrageous, revolting, brutal, or shocking.

By contrast, 17–A M.R.S.A. § 203(1)(A) provides for the manslaughter conviction of any defendant who "with criminal negligence" causes the death of another person. "Criminal negligence" is defined in section 10(4) of the Criminal Code as follows:

> 4. "Criminal negligence."
>
> A. A person acts with criminal negligence with respect to a result of his conduct when he fails to be aware of a risk that his conduct will cause such a result.
>
> . . . .
>
> C. For purposes of this subsection, the failure to be aware of the risk, when viewed in light of the nature and purpose of the person's conduct and the circumstances known to him, must involve a gross deviation from the standard of conduct that a reasonable and prudent person would observe in the same situation.

17–A M.R.S.A. § 10(4).

By the language of section 10(4)(C), which defines criminal negligence in terms of a "*gross* deviation from the standard of conduct that a reasonable and prudent person would observe in the same situation" (emphasis added), the legislature in 1975 clearly indicated its intention to perpetuate the pre-Code judicial reading of criminal negligence as "gross or culpable negligence."[5] *See* "Comment to former section 205—1975," following 17–A M.R.S.A. § 203 (Supp. 1980); *see also State v. Jones*, 152 Me. 188, 191, 126 A.2d 273, 275 (1956), *citing and quoting State v. Wright*, 128 Me. 404, 405, 148 A. 141, 142 (1929). The pre-Code cases further identified the gross, or criminal, negligence required to sustain a conviction for involuntary manslaughter as "negligence of a higher degree than that required to establish liability upon a mere civil issue." *State v. Ellis, supra* at 776, *citing and quoting State v. Ela*, 136 Me. 303, 308, 8 A.2d 589, 592 (1939).

Both civil and criminal liability for negligence are defined in terms of unreasonable risk created by the actor's conduct when objectively judged. *Cf.* W. LaFave & A. Scott, Jr., *supra*, § 30 at 209–11. But to constitute criminal negligence the risk involved must be greater in degree than will suffice for civil negligence. A jury to convict for manslaughter by criminal negligence must determine not merely that the defendant had been responsible for a "lack of ordinary care," *Hutchins v. Inhabitants of Penobscot*, 120 Me. 281, 286, 113 A. 618, 620 (1921), or a "failure to provide against the ordinary occurrences of life." *Michalka v. Great Northern Paper Co.*, 151 Me. 98,

---

5. In Maine law the term "gross negligence" has special significance only in defining criminal liability. *Cf. Winslow v. Tibbetts*, 131 Me. 318, 321, 162 A. 785, 787 (1932).

Some pre-Code cases stated that a finding of criminal negligence sufficient to give rise to a manslaughter conviction would be appropriate whenever the defendant was guilty of "gross or culpable negligence . . . involv[ing] reckless disregard for the lives or safety of others." *State v. Hamilton*, 149 Me. 218, 239, 100 A.2d 234, 244 (1953), *citing and quoting State v. Ela*, 136 Me. 303, 308, 8 A.2d 589, 592 (1939). *See also State v. Lewisohn*, Me., 379 A.2d 1192, 1206, 1207 (1977); *State v. Ellis*, Me., 325 A.2d 772, 776 (1974). That formulation would thus seem to have imparted a subjective component into the criminal negligence element of the pre-Code offense of involuntary manslaughter. *But see State v. Jones*, 152 Me. 188, 191, 126 A.2d 273, 275 (1956); *State v. Wright*, 128 Me. 404, 405, 148 A. 141, 142 (1929); *State v. Pond*, 125 Me. 453, 456, 134 A. 572, 573 (1926) (cases not citing "recklessness" as an element of involuntary manslaughter). Be that as it may, our Criminal Code now makes it clear that a person who has caused the death of another is guilty of manslaughter if he has acted *either* "recklessly, *or* with criminal negligence." 17–A M.R.S.A. § 203(1)(A) (Supp. 1980) (emphasis added).

104, 116 A.2d 139, 143 (1955), but further that his conduct manifested a higher degree of carelessness, going beyond "the civil definition of negligence into the criminal definition of negligence." *See State v. Lewisohn, supra* at 1206. Accordingly, the Law Court on several occasions has reversed manslaughter convictions on the ground that the justice presiding at trial had failed to instruct the jury adequately on the difference between ordinary, or civil, negligence and gross, or criminal, negligence, *see State v. Jones, supra; State v. Wright, supra,* or on the ground that the evidence was insufficient to show that the defendant was guilty of criminal, as opposed to civil, negligence, *State v. Ela, supra.*

Before the Criminal Code our cases gave factual content to the narrow distinction of degree between ordinary and gross negligence. Thus, this court upheld manslaughter convictions in cases where the defendant as a practical joke threw a ten-year-old boy, who had said he could not swim, into a 20-foot deep section of the Penobscot River and was then unable to save him from drowning, *State v. Pond,* 125 Me. 453, 134 A. 572 (1926), and where the defendant, who was driving a tractor-trailer rig on the wrong side of the road after an afternoon of drinking, forced a car coming in the opposite direction off the road, causing the death of a passenger in that car. *State v. Hamilton,* 149 Me. 218, 100 A.2d 234 (1953). *See also Regina v. Benge,* 4 Foster & Finlason 504, 176 Eng.Rep. 665 (1865) (the defendant, a railway track repair foreman, negligently misread a plainly printed train schedule and gave orders to take up a section of track at a time when a train was due, causing an accident and several deaths).

The Model Penal Code also helps us in interpreting our Criminal Code's definition of "criminal negligence." Our Code's sec-

tion 10(4)(C) closely parallels the Model Penal Code definition of "negligence." *See* Model Penal Code (U.L.A.) § 2.02(2)(d) (1974).[6] Under section 210.4 of the Model Penal Code, to return a conviction for negligent homicide, "[t]he jury must find *fault* and find it was *substantial*; that is all ... that can be said in legislative terms." (Emphasis added) *Id.* § 2.02, Comment at 126 (Reprint—Tent. Draft No. 4, 1955). Thus, the Model Penal Code provides for the conviction of a criminally accused who has caused a death with negligence that is different "from ordinary negligence only in degree, not in kind." *State v. Bier,* 591 P.2d 1115, 1118 (Mont.1979) (under Model Penal Code standard, the defendant was guilty of negligent homicide where he pulled from a drawer, cocked, and threw a loaded gun within the reach of his intoxicated wife, who was shot when she pointed the gun at her head and defendant tried to knock it out of her hand), *citing* W. Prosser, *Law of Torts* § 34 at 183 (4th ed. 1971).

In sum, the legislature by returning in 1977 to the pre-Code homicide standards and reinstituting criminal liability for murder on the basis of an objective showing of brutal or heinous conduct established a scale of actionable wrongdoing with respect to death-producing conduct that retained the differences between the several civil and criminal actions established by pre-Code common law and statutes. In so doing, the legislature recognized anew the familiar and long-established principle that "an act causing death may be murder, manslaughter, or misadventure, according to the degree of danger attending it," *Commonwealth v. Pierce,* 138 Mass. 165, 178 (1884) (Holmes, J.).

At the lower end of the scale is mere ordinary negligence consisting of no more than a failure to exercise due care. A person whose merely negligent conduct re-

---

6.  Model Penal Code § 2.02(2)(d) provides that:
    A person acts negligently with respect to a material element of an offense when he should be aware of a substantial and unjustifiable risk that the material element exists or will result from his conduct. The risk must be of such a nature and degree that the

actor's failure to perceive it, considering the nature and purpose of his conduct and the circumstances known to him, involves a gross deviation from the standard of care that a reasonable person would observe in the actor's situation.

sults in the death of another will in Maine be subject at most to liability for tort damages. At the point next higher on the scale, conduct that creates a " 'high degree' of risk (something more than mere 'unreasonable' risk)," W. LaFave & A. Scott, Jr., *supra* at 542, and which constitutes a "gross deviation from the standard of conduct that a reasonable and prudent person would observe in the same situation," 17–A M.R.S.A. § 10(4)(C), will serve as the basis for manslaughter liability; but, "it will not do for murder," W. LaFave & A. Scott, Jr., *supra* at 542. At the upper end of the scale, the actor's conduct, even though also both civilly and criminally negligent, objectively manifests savagery or brutality, reflecting a " 'very high degree' of risk" that death will result, *id.* At that final point, the "degree of danger attending" the death-producing act is reckoned in law to be "very great, as in the case of an assault with a weapon found by the jury to be deadly, or an assault with hands and feet upon a woman known to be exhausted by illness." *Commonwealth v. Pierce, supra* at 178. The legislature has determined that upon findings of death-producing conduct objectively manifesting savagery or brutality, a factfinder would be justified in concluding that there had occurred a killing of the highest degree of blameworthiness and accordingly punishable by the severest penalties provided for by law. *See State v. Lagasse, supra* at 540. *See also State v. Lewisohn, supra* at 1206–07 (approving pre-Code jury instructions explaining the difference in degree between accident, wrongful death, involuntary manslaughter, implied malice murder, and express malice murder).

■ Although it is true that the differences between mere civil liability, manslaughter, and murder are a matter of degree, we will not for that reason alone disturb the legislative determination that established that scale of differences.[7] In the case at bar, the jury could have found that defendant lifted the five-year-old Tim-

othy by the feet, swung him around over his head, and then let the boy go head first into a wall, thereafter leaving him to lie on a mattress for several days, unconscious and without medical or any other kind of attention. Alternatively or additionally, the jury could have believed that for a significant time defendant withheld food from Timothy. They could have found that either course of conduct resulted in the child's death. Either alone was sufficient to permit the jury to conclude that defendant, in causing Timothy's death, had engaged in savage and brutal conduct, objectively manifesting a depraved indifference to the value of human life.

■ Our task is, however, not done. We must also review the jury instructions given by the presiding justice to be sure that those instructions properly communicated the difference between the offenses of depraved indifference murder and criminal negligence manslaughter. The justice instructed the jury, with respect to depraved indifference, that:

First, the death-producing conduct must be conduct which, by its very nature, creates a very high degree of risk of serious bodily injury or death.... Second, the death-producing conduct must be conduct which, when objectively viewed, demonstrates an almost total lack of concern or feeling for the value of human life.... [T]he conduct must demonstrate a lack of appreciation for human life as well as an absence of moral sense. Thus, the indifference to the value of human life must be such that it would generally—that it would be generally regarded by mankind as depraved.

Later in his charge, the presiding justice told the jury, in keeping with the statutory definition, that criminal negligence involves a failure to be aware of a risk that the conduct in question will cause death, and constitutes a "gross deviation from the standard of conduct that a reasonable and

---

7. *See Haddock v. Haddock*, 201 U.S. 562, 631, 26 S.Ct. 525, 552, 50 L.Ed. 867 (1906) (Holmes, J. dissenting) ("I am the last man in the world to quarrel with a distinction simply because it is one of degree. Most distinctions, in my opinion, are of that sort, and are none the worse for it."), *cited* by W. LaFave & A. Scott, Jr., *supra* at 542 n. 3.

prudent person would observe in the same situation." When the jury returned to the courtroom after several hours of deliberations to receive additional instructions on depraved indifference and criminal negligence, the justice essentially repeated his earlier instructions. As in *State v. Lewisohn, supra* at 1208, "we do not believe the jurors were misled to assume that a mere finding of gross negligence could support a murder conviction." The two sets of instructions adequately presented to the jury the difference between the offenses of depraved indifference murder and criminal negligence manslaughter that the statutory framework and this court's interpretations of it have established. We find no error in those instructions.

## II. The Challenge to the Indictment.

Defendant next challenges the sufficiency of the indictment upon which he was convicted. That indictment charged in full:

That on or about the 5th day of December, 1978, in the County of Penobscot and State of Maine, Vinal R. Crocker did intentionally or knowingly cause the death of Timothy Crocker or did engage in conduct which manifested a depraved indifference to the value of human life and which in fact caused the death of Timothy Crocker.

On appeal, defendant does not challenge the validity of the portion of the indictment relating to intentional or knowing killing, but does attack as insufficient the pleading of "depraved indifference" murder. He claims it does not set forth an adequate particularization of the facts underlying the offense.

▇▇▇ Defendant raised this claim only after the jury had been impaneled for his trial. M.R.Crim.P. 12(b)(2), however, requires that such a defense be made prior to trial unless failure to do so is excused for cause shown. No such excuse appears in the record. Accordingly, defendant has waived any objection to the sufficiency of this indictment. *See State v. Davenport, supra* at 9.

▇▇▇ In any event, his attack on the indictment is clearly without merit. An indictment is sufficient if

a respondent of reasonable and normal intelligence, would, by the language of the indictment, be adequately informed of the crime charged and the nature thereof in order to be able to defend and, if convicted, make use of the conviction as a basis of a plea of former jeopardy, should the occasion arise.

*State v. Wing*, Me., 426 A.2d 1375, 1376 (1981), *citing and quoting State v. Charette*, 159 Me. 124, 127, 188 A.2d 898, 900 (1963). Thus, the presiding justice was correct in denying defendant's motion on its merits. The indictment notified defendant that he was charged with depraved indifference murder in connection with the death of Timothy Crocker on or about December 5, 1978. The name of the victim and the date the offense was alleged to have occurred, taken together with the recitation of the language of the statute defendant was charged with violating, were sufficient to sustain his subsequent conviction. *See State v. Thibodeau*, Me., 353 A.2d 595, 601 (1976) (indictment for breaking, entering and larceny in the nighttime); *State v. Chick*, Me., 263 A.2d 71, 74–75 (1970) (indictment for conspiracy and cheating by false pretenses); *see also* M.R.Crim.P. Form 4. If defendant wanted further specification of what conduct the State alleged "manifested a depraved indifference to the value of human life," he could have asked for a bill of particulars. *See* M.R.Crim.P. 16(c)(2); *State v. Sampson*, Me., 387 A.2d 213, 216 (1978); *State v. Davenport, supra* at 9–10. The presiding justice correctly refused to dismiss the portion of the indictment charging defendant with depraved indifference murder.

## III. The Propriety of the Presiding Justice's Refusal to Dismiss the Entire Jury Panel.

Defendant claims that the presiding justice erred in refusing to dismiss the entire jury panel in light of disclosures that some

panelists,[8] while waiting for their voir dire, had disregarded the court's instructions not to talk with each other about defendant's upcoming trial.

Jury selection lasted three days. At the close of the first day, the presiding justice instructed the panelists not to discuss the case with each other or with anyone else. On the afternoon of the second day, however, one panelist, Mr. Dunning, in response to a question by defense counsel concerning Mr. Dunning's prior knowledge of the case through media accounts, revealed that he had overheard someone in the jury room that morning mention the name "Mr. Crocker" and "something about cigarette burns on a young child." Mr. Dunning, however, answered that the overheard conversation would not affect his ability to sit impartially on the case; and neither counsel challenged him for cause.

After Mr. Dunning had been passed for cause, however, defense counsel moved to dismiss the entire jury panel. The presiding justice denied that motion, but stated that he would permit counsel to ask panelists on subsequent voir dire whether they had heard any jury room conversations about the case, and if so, whether the information thus revealed to them would prejudice them in any way.[9] The justice further stated that once the total number of potential jurors needed to allow full exercise of peremptory challenges had been passed for cause, he would ask of the entire panel remaining whether anyone had heard any conversations in the jury room.

At the close of the second day of the jury selection proceedings, defense and prosecution at the court's direction exercised about half of their peremptory challenges. At that time defense counsel renewed her con-

tention that the presiding justice should closely question at least the jurors who were tentatively selected on the second day of voir dire, before Mr. Dunning's story had become known. The presiding justice refused to do so, noting that each juror had been fully interrogated regarding his or her interest in or knowledge of the case and had satisfactorily indicated that he or she was not prejudiced in any way by anything he or she might have heard or read.

Finally, when the full number of potential jurors required to allow exercise of all peremptory challenges had been passed for cause, the justice asked the entire group whether any one of them had said or heard anything relating to the facts of the case. Only one juror, Mr. Martin, responded that he had. During an individual voir dire in chambers, Mr. Martin stated that an unknown woman member panelist told him, as both were getting on the bus to go to lunch that day, that she was surprised to have been picked for the jury because she had told the court she knew it was a child abuse case. Mr. Martin stated that he did not feel that the knowledge he had thus gained would prejudice his ability to serve impartially. Mr. Martin was not challenged, either for cause or peremptorily, by either side. Defense counsel at that time renewed her earlier objection to the impaneling of jurors without individual voir dire on the subject of jury room conversations.

We do not find any abuse of discretion in the way the presiding justice handled the impanelment of the jury in the face of the limited discussions that had apparently taken place within the jury panel of the nature of the upcoming case. As this court held in *State v. Thibeault*, Me., 390

---

8. References to the "jury panel" and "panelists" are to the group of veniremen from which the trial jury was drawn. References to the "jury" or "jurors" are to the trial jurors and alternates.

9. After Mr. Dunning's testimony, in response to the close questioning the trial justice permitted counsel on the issue, a couple of other members of the jury pool also stated that they had overheard conversations about the case in the jury room. The substance of those conversa-

tions related in one instance to the fact that Martha Crocker was "serving time" in connection with the death of a child, and in another to the method of jury selection in the case at bar. In each case the prospective juror indicated his ability to consider the evidence in the case impartially. Notwithstanding the affirmations of the juror who had overheard the remark about Martha Crocker, the State successfully challenged that juror for cause.

A.2d 1095, 1099 (1978), "[w]hether a fact brought out on voir dire requires a new trial depends on whether the fact has 'such high potential for ineradicable prejudicial impact upon those who ultimately become jurors as to deny to the defendant a fundamentally fair trial'." In *Thibeault* we also emphasized that "[t]he determination of existence of prejudice is for the trial court to make" and that its finding "ought not be set aside by a reviewing court, unless the error is manifest." *Id.* Quoting from *Arizona v. Washington*, 434 U.S. 497, 513, 98 S.Ct. 824, 834, 54 L.Ed.2d 717 (1978), we explained that the trial court "is far more 'conversant with the factors relevant to the determination' than any reviewing court can possibly be." *Id.*

According, as we must, deference to the trial court's on-the-spot assessment of the effect of the extrajudicial information that came to the attention of a few of the panelists, we can find no basis in the present circumstances for an appellate court to vacate defendant's conviction. He fails to show that his right to a fundamentally fair trial was endangered.

■ The information known to some of the panelists was that the upcoming trial involved a "child abuse case" and "something about cigarette burns on a young child." The criminal charge on which defendant was tried did indeed involve child abuse, and at trial the jury did hear evidence of cigarette burns on the body of the victim. To that extent the prejudicial matter was not extraneous and inadmissible in the way that the information that the defendant in *Thibeault* had once been in a mental hospital was extraneous and inadmissible. That fact significantly reduces any likelihood that the isolated discussions within the jury panel in fact denied Vinal Crocker a fundamentally fair trial; but it does not end the matter. An "essential wrong" nonetheless occurs if panelists hear even admissible information, because potential jurors may form early conclusions from

that extrajudicial information without giving the defendant any opportunity for objection, explanation, or argument. *Cf. Heffron v. Gallupe*, 55 Me. 563 (1868) (juror after close of evidence obtained transcript of prior trial from one party).

■ In any event, we reject defendant's claim of reversible error on the facts of this case. The presiding justice made a painstaking and thorough investigation on voir dire to determine whether the panel discussions had had any prejudicial effect. Every person who sat on the Crocker jury was asked prior to impanelment whether he or she had overheard or participated in discussions of the upcoming case. Also, the justice reasonably could conclude that the extrajudicial information involved had, in the context of this particular case, a relatively small potential for mischief, and that further questioning of panelists individually and in chambers might itself do harm to defendant. In these circumstances, the Superior Court justice's refusal to dismiss the entire jury panel fell well within the permissible range of his discretion.

## IV. The Propriety of the Presiding Justice's Oversight of the Peremptory Challenges.

Before the final jury of twelve members and two alternates was chosen, 47 prospective jurors had to be passed for cause, in order to allow the State and defendant to exercise the total of 33 peremptory challenges allowed them.[10] At the end of the first two days of voir dire, only 35 prospective jurors had been passed for cause, necessitating a third day of proceedings in order to select the additional persons needed to complete the total pool of 47. To reduce the number of potential jurors that would have to be sequestered, under the then prevailing practice of sequestration in murder cases, the presiding justice, at the close of the second day, ordered the prosecutor to exercise 5, and defendant to exercise 10, of their peremptory challenges. On the next

10. The State was allowed 11 peremptory challenges and defendant 22. *See* M.R.Crim.P. 24(c)(3), (d).

day the twelve persons needed to complete the final pool of prospective jurors were passed for cause. Following the selection of the final prospective juror, the parties exercised all their remaining peremptory challenges, with the State using 6 and defendant 12. Both sides were able to exercise those final peremptory challenges to remove both jurors who had not already been peremptorily challenged after the second day of voir dire and jurors who had only been passed for cause on the third day and who had thus not previously been subject to challenge.

■ On appeal defendant asserts that the presiding justice erred in requiring him to exercise his peremptory challenges in two stages because, he claims, he was thereby deprived of the opportunity to exercise those challenges on a fully comparative basis. We note first that defendant failed timely to raise an objection to the two-stage exercise of peremptories. Although defense counsel objected prior to making her first 10 peremptory challenges, and again both after the jury was finally impaneled and shortly before the court began taking testimony, the record reveals that the basis of her objection on each occasion was that she had not been permitted to conduct an individual voir dire of those jurors who were passed for cause prior to the disclosure that conversations about the case had taken place in the jury room. At no time did counsel indicate that she was displeased with having to exercise peremptory challenges in two stages. We thus will uphold the Superior Court justice's management of the peremptory challenges unless it was fraught with obvious error affecting defendant's substantial rights. *See* M.R. Crim.P. 52(b); M.R.Evid. 103(a); Field & Murray, *Maine Evidence* § 103.2 (1976).

■ We find no error, obvious or otherwise, in the presiding justice's handling of the exercise of peremptory challenges in the case at bar. The existence and exercise of peremptory challenges in Maine are controlled by 15 M.R.S.A. § 1258 (1980). In that section the legislature delegated to the Supreme Judicial Court the authority to prescribe by rule "the manner of exercising all challenges, and the number and order of peremptory challenges." Pursuant to that statutory grant of authority, the Supreme Judicial Court has prescribed in M.R. Crim.P. 24(c)(2) that:

> In an action in which the state is entitled to 10 peremptory challenges and the defendant or defendants jointly to 20 peremptory challenges, the state shall exercise the first challenge, the defendant or defendants jointly shall then exercise two challenges, and the state and the defendant or defendants jointly shall continue to alternate exercising peremptory challenges, with the state exercising its challenges one at a time, and the defendant or defendants jointly exercising challenges two at a time, until both sides have exhausted their allotted number of peremptory challenges.

While Rule 24(c)(1) does state that "[t]he court may permit counsel to exercise a peremptory challenge of a juror immediately following the examination of that juror," the rule nowhere expressly provides for or prohibits the kind of two-stage exercise of peremptory challenges that was engaged in here. Except as prescribed by the rule, the management of peremptory challenge is left to the discretion of the justice presiding at trial. *Cf. State v. Lizotte,* Me., 249 A.2d 874, 877 (1969); H. Glassman, *Rules of Criminal Procedure with Commentaries* § 24.1 at 180 (1967); *id.* § 24.4 (Supp.1975). As long as parties "are afforded the appropriate number of peremptory challenges and [are] permitted to exercise them on a comparative basis, minor variations in practice" are permissible. H. Glassman, *supra* at 180.

The presiding justice's management of the peremptory challenges permitted defendant to exercise his challenges on a fully comparative basis. At the end of the second day of voir dire, his counsel struck 10 jurors from the list of those who had so far been passed for cause. Defendant would have had no need to employ any of those 10 challenges to strike any of the 12 potential jurors who were passed for cause

on the next day, because he still had 12 challenges left, all of which he could use, if necessary, to strike every one of the 12 new pool members. On the other hand, if he wished, he was free also to exercise any or all of the 12 challenges remaining to him on the third day to strike pool members tentatively selected on the first or second day of voir dire.

■ Defendant was thus not prejudiced in any way by being required to exercise his peremptory challenges in two steps. At the end of the second day, only 12 more potential jurors remained to be passed for cause, and after defendant's first-stage exercise of 10 peremptories, he still had 12 challenges left. Thus, even if the peremptories had been exercised at one time, defendant would in any event have had either himself to challenge—or to leave to be stricken by the court, if he chose not to exercise all his peremptories—at least 10 prospective jurors from those who were passed for cause on the first and second days of voir dire. In no way did the Superior Court justice's management of the peremptory challenges diminish or handicap defendant's right to use all 22 of his peremptory challenges to their full effect.

## V. The Claim that the State Should Bear the Burden of Proving Defendant's Lack of Mental Disease or Defect.

■ Under 17–A M.R.S.A. § 58(1), an accused lacks criminal responsibility if

at the time of the criminal conduct, as a result of mental disease or defect, he either lacked substantial capacity to conform his conduct to the requirements of the law, or lacked substantial capacity to appreciate the wrongfulness of his conduct.

Under section 58(3) the Criminal Code assigns to the defendant "the burden of proving, by a preponderance of the evidence, that he lacks criminal responsibility as described in subsection 1." Defendant Vinal Crocker on appeal argues that the burden of proof on the insanity defense should not, and constitutionally may not, be placed upon him when charged with a crime, namely, depraved indifference murder, that does not have a subjective culpable mental state as an element to be proved by the State.

We find no merit in defendant's argument. Nothing in the legislative language would permit us to carve out from section 58(3) the exception that is urged by defendant; and we have repeatedly held—both before and after the enactment of the Criminal Code—that the allocation by section 58(3) of the burden of proving lack of criminal responsibility is permissible under the Maine and United States Constitutions. *State v. Ellingwood*, Me., 409 A.2d 641, 643 (1979); *State v. Tracy*, Me., 372 A.2d 1048, 1049 n.2 (1977); *State v. Armstrong*, Me., 344 A.2d 42, 46 (1975); *State v. Melvin*, Me., 341 A.2d 376, 379 (1975); *State v. Buzynski*, Me., 330 A.2d 422, 429–31 (1974). *See also Patterson v. New York*, 432 U.S. 197, 97 S.Ct. 2319, 53 L.Ed.2d 281 (1977) (states may require defendants to prove any defense except the negative of an element of the offense charged).

## VI. The Challenge to the Competence to Testify of the Child Witness, Crystal Crocker.

■ Near the end of its case in chief, the State called as a witness defendant's eight-year-old stepdaughter, Crystal Crocker. After extensive voir dire by the court and both counsel, out of the presence of the jury, the presiding justice ruled Crystal competent to be a witness. From the record it appears that defendant never objected to that ruling. Our review of this issue is thus, once again, for obvious error affecting substantial rights. *See* M.R.Crim.P. 52(b).

■ By M.R.Evid. 601(b) a witness is disqualified from testifying only if the court finds

that (a) the proposed witness is incapable of expressing himself concerning the matter so as to be understood by the judge and jury either directly or through interpretation by one who can understand him, or (b) the proposed witness is incapa-

ble of understanding the duty of a witness to tell the truth.

When a witness of tender years is proposed, "the court must exercise its sound judicial discretion to evaluate the child's testimonial competency under Rule 601 on the basis of the totality of the voir dire." *State v. Vigue*, Me., 420 A.2d 242, 246 (1980); see also *State v. Pinkham*, Me., 411 A.2d 1021, 1024 (1980). In the absence of any written factfinding by the presiding justice, *State v. Broucher*, Me., 388 A.2d 907, 909 (1978), there were implicit in his ruling findings of fact that Crystal could express herself so as to be understood by the jury and that she was capable of understanding the duty of a witness to tell the truth. Despite her youth, Crystal understood the questions propounded to her and gave intelligent answers that clearly showed an ability and desire to differentiate between truth and falsity.[11] She knew that she should not lie and that when she did, she would be "punished." That is more articulation of the consequences of falsehood than the child witness in *State v. Vigue, supra* at 245–46 n. 2, gave. On the "totality of the voir dire," *see State v. Pinkham, supra* at 1024, there is no basis for an appellate court to hold that the presiding justice abused his discretion in determining that Crystal was competent to be a witness. The justice committed no error in receiving her testimony.

## VII. The Evidentiary Challenges.

Defendant next attacks his conviction on the ground that certain medical testimony and certain photographs were improperly admitted in evidence against him. After a

thorough review of his contentions on this score, we find no error as to any of them.

A. The Medical Testimony.

1. The Testimony Relating to the Bruises and Burns on Timothy Crocker's Body at the Time of Death.

At trial the State offered in evidence testimony through several medical witnesses relating to Timothy Crocker's physical condition at the time he was admitted to the hospital and at the time of his death. Defense counsel offered to stipulate that Timothy Crocker had died, and that his death had been caused by a blow to the head and profound malnutrition. Over defendant's objection, the various nurses and doctors who testified for the State were permitted to describe their observations of bruises and burns on Timothy's body. Defendant claims that the presiding justice should have excluded the evidence either because it was irrelevant or, if relevant, because its prejudicial effect exceeded its probative value.

The presiding justice's rulings on the questions of the relevance, M.R.Evid. 401, of the medical testimony, and of the balance to be struck between that evidence's probative value and its potential unfair prejudicial effect, M.R.Evid. 403, are reviewable only for abuse of discretion. *See State v. Morton*, Me., 397 A.2d 171, 178–79 (1979) (relevance); *State v. DiPietro*, Me., 420 A.2d 1233, 1235 (1980) (balancing of probative value and prejudical effect). We can find no abuse of discretion in the admission in evidence of the testimony of the State's medical witnesses.

11. Under questioning by the prosecutor on voir dire, Crystal testified as follows:

Q Now, Crystal, what does it mean when you tell a lie?
A It means you are not telling the truth.
Q I can't hear you.
A It means you are not telling the truth.
Q Let me kind of test you to see if you know what it would be to tell a lie, okay? If I told you that the Judge had on a red robe, would that be the truth or would that be a lie?
A It would be a lie.

Q Let me test you on something else. If I told you that the desk was brown, would that be the truth or would that be a lie?
A That would be the truth.
Q Let me test you one more time to see if I can catch you. If I told you that [my colleague] had on a green suit, would that be the truth or would that be a lie?
A It would be a lie.
Q What color is [his] suit?
A Brown.
Q And what color is the Judge's robe?
A Black.
Q I don't have any further questions.

Under M.R.Evid. 401,[12] the presiding justice could have determined that evidence of the bruises and burns, when tied to defendant, as they were by the express testimony of several eyewitnesses or by implications properly discernible in that testimony, tended to make it more probable than not that defendant had knowingly or intentionally engaged in an ongoing course of conduct of which the acts immediately leading to Timothy's death from malnourishment and a head injury constituted only the final chapters. The evidence of the victim's physical condition was also probatively helpful to the jury in assessing by an objective standard whether the conduct resulting in that condition "manifested a depraved indifference to the value of human life." The justice moreover could have determined that the medical evidence, in tending to establish that defendant had engaged in a history of abusive treatment of Timothy, refuted any defense that defendant's conduct that caused Timothy's death was accidental and furthermore contradicted defendant's version of the circumstances surrounding Timothy's death, thus damaging defendant's credibility.

■ The justice then could have concluded, under M.R.Evid. 403,[13] that the probative value of that medical evidence outweighed any tendency in that evidence to be unfairly prejudicial to defendant or to confuse the jury. While the issue of child abuse is of course an emotion-laden one, the presiding justice committed no abuse of discretion in permitting the State to show that child abuse was a factor in this case. The child abuse that the medical testimony tended to prove was directly relevant to defendant's state of mind and an objective assessment of the nature of his conduct, as well as to defendant's credibility and his defense of accident. While that testimony

was indeed adverse to defendant's position it did not rise to the level of "unfair" prejudice required to invoke the discretionary standard of Rule 403, see State v. Lagasse, supra at 541; State v. Hurd, Me., 360 A.2d 525, 527 n. 5 (1976). The Superior Court justice correctly exercised his permitted discretion in allowing in evidence the medical testimony regarding the burns and bruises on the victim's body.

2. The Testimony Relating to the June, 1978, Incident.

The State also called Dr. James Lawsing to testify concerning his treatment of Timothy for a broken leg in June, 1978, about six months before Timothy's death. Defendant objected to that testimony, again asserting that it would be irrelevant and in any event unduly prejudicial. The presiding justice overruled those defense objections and permitted the testimony. Dr. Lawsing then stated that Vinal and Martha Crocker had brought Timothy to the Eastern Maine Medical Center on June 7, 1978, that he had examined Timothy at that time and had found a spiral fracture of the left femur, as well as numerous bruises and scratches, and that Mr. and Mrs. Crocker had stated that Timothy had injured himself by falling off a bicycle. Dr. Lawsing testified that in his opinion Mr. and Mrs. Crocker's version of the events leading up to the injury was not consistent with the nature of the injury itself.

■ Defendant's argument that Dr. Lawsing's testimony was not relevant to any of the issues in the case at bar and that it was in any event more unfairly prejudicial, confusing, or misleading than probative is premised on the assertion that that testimony concerned events temporally too remote from the November incidents that

**12.** M.R.Evid. 401 provides:
"Relevant evidence" means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.

**13.** M.R.Evid. 403 provides:

Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

directly led to Timothy's death to be helpful to the jury in determining defendant's guilt or innocence. The effect of remoteness goes primarily to the weight to be accorded to evidence rather than to its relevance. Remoteness is thus ordinarily a question for the jury. *See State v. Warren*, Me., 312 A.2d 535, 544–45 (1973). Dr. Lawsing's testimony, particularly when coupled with the other medical evidence discussed above, tended to establish that defendant had participated in a pattern of child abuse leading up to Timothy's death, that he had done so either intentionally or knowingly, or by conduct manifesting depraved indifference to the value of human life, that the incidents directly resulting in Timothy's death were not accidents, and that defendant himself was not telling the truth when he claimed on the witness stand that he had never abused Timothy and that Timothy's death was accidental. The probative value of that testimony far outweighed any unfair prejudice or confusion that might have resulted from admitting it. The presiding justice committed no abuse of discretion in permitting Dr. Lawsing to testify.

B. The Photographs of Timothy Crocker in November, 1978, and June, 1978.

At trial, the presiding justice admitted in evidence two groups of photographs, one group showing Timothy's condition at the start of his final hospitalization in November, 1978, and the other showing him during his June, 1978, hospitalization. On appeal, defendant asserts that those photographs were improperly admitted, on the grounds that all of them were irrelevant and unfairly inflammatory and that the June photographs were remote.

Maine law is clear that photographs are admissible if they are true and accurate depictions of what they purport to represent, if they are relevant to some issue involved in the litigation, and if their probative value is not outweighed by any tendency they may have toward unfair prejudice. *See State v. Sargent*, Me., 361 A.2d 248, 251 (1976); *State v. Berube*, Me., 297 A.2d 884, 888 (1972). The issue of whether to admit photographs that are offered in evidence is a matter for the sound discretion of the justice presiding at trial. *State v. Conwell*, Me., 392 A.2d 542, 544 (1978).

In the case at bar, there was testimony, unchallenged by defendant, that both the November and the June photographs fairly and accurately portrayed their subjects. Both groups of photographs themselves were also relevant to the case at bar, in the same ways that the November and June medical testimony was relevant. Both the November and June photographs showed Timothy's body covered with a number of bruises, cuts, and abrasions; in the November photographs, Timothy was malnourished as well. The photographs in both instances not only served to illustrate the medical testimony, *see State v. Woodbury, supra* at 1169, but tended to help the jury to perform its task of assessing defendant's culpability. *See State v. Conwell, supra* at 544. The conditions depicted in the photographs were consistent with an ongoing pattern of child abuse that, when linked to defendant as it was by other evidence, tended to establish that defendant was acting either intentionally, knowingly, or in a manner that manifested a depraved indifference to the value of human life, when he engaged in the conduct that actually resulted in Timothy's death. The photographs thus also tended to refute the defense of accident, *see id.; cf. State v. Woodbury, supra* at 1169.

For the reasons discussed earlier in connection with the admissibility of Dr. Lawsing's testimony concerning the June, 1978, injuries to Timothy, the presiding justice was justified in refusing to exclude the June, 1978, photographs on the ground that the injuries they depicted were remote in time from Timothy's death. The photographs of the June injuries, tending as they did to establish the existence of a consistent history of child abuse for more than six months, were relevant to the issue of defendant's criminal culpability.

Although the medical witnesses verbally described the victim's condition in

June and November before his death, by no means were the photographs merely cumulative. The pictures conveyed relevant information to the jury in a much more complete and meaningful form than could the almost clinical words of the doctors and nurses.

It is true that the November photographs might be characterized by many as "gruesome." It would be difficult to imagine them otherwise, given the fact that this was a case involving serious abuse perpetrated upon a five-year-old child. Gruesomeness, however, does not alone make photographs inadmissible.

> The law is well settled that the mere fact that a photograph is gruesome is not a reason for its non admission .... The presiding justice has great latitude and discretion in determining the admissibility of photographs and unless there is shown an abuse of discretion, his ruling will not be disturbed on [appeal].

*State v. Coty*, Me., 229 A.2d 205, 214 (1967), *citing and quoting State v. Ernst*, 150 Me. 449, 454, 114 A.2d 369, 373 (1955). Under M.R.Evid. 403 the question for the presiding justice was whether the "probative value [of the photographs was] *substantially* outweighed by the danger of *unfair* prejudice." (Emphasis added) *See* Field & Murray, *supra*, § 403.5 (1976 & Supp. 1980). Considering the "great latitude and discretion" accorded the trial judge in deciding that question, we cannot say that he erred in finding that any danger of unfairness (as opposed to prejudice, which exists in any probative evidence adverse to defendant)[14] did not rise to the level of *substantially* outweighing the obvious probative value of the photographs. *See State v. Woodbury, supra; State v. Conwell, supra*. On this record we find no abuse of discretion in the trial justice's treatment of the photographs.

**VIII. The Sufficiency of the Evidence.**

Defendant asserts that the evidence before the jury was insufficient to support his conviction for murder. We cannot agree. "In reviewing the sufficiency of

the evidence, we apply the standard that the conviction must be set aside if 'no rational trier of fact could [find] proof of guilt beyond a reasonable doubt'." *State v. Lagasse, supra* at 542, *citing and quoting Jackson v. Virginia*, 443 U.S. 307, 324, 99 S.Ct. 2781, 2792, 61 L.Ed.2d 560 (1979). Our examination of the record reveals more than ample evidence from which the jury could have concluded beyond a reasonable doubt that defendant intentionally or knowingly, or by conduct manifesting a depraved indifference to the value of human life, caused the death of Timothy Crocker.

On the basis of the medical testimony before it, the jury could have found that Timothy died from either or both of two causes: a blow to the head or malnutrition. The jury could have believed Crystal Crocker's testimony that several days before Timothy was finally hospitalized, defendant picked Timothy up and swung him around by his heels over defendant's head, letting him go head first into a wall, that Timothy immediately lost consciousness, and that he was left to lie unattended on a mattress for "three or four" days. The jury could have found support for Crystal's story in the medical testimony that Timothy's head injury was consistent with his having received a single blow, that his dehydrated condition could have resulted from his not having ingested fluids for several days, and that the pressure sores on his ankles and elsewhere on his body probably resulted from his having lain on his back without being turned for several days. The jury could also have credited Charles Amero's testimony that defendant had deprived Timothy of food during the first two weeks of November, 1978—just prior to Timothy's death—when Amero, defendant's brother-in-law, was renting a room at defendant's home. From that testimony and from the evidence that Timothy was severely emaciated, the jury could have inferred that Timothy was not given enough to eat thereafter and that defendant was at least in part responsible for that course of conduct.

---

14. *See State v. Hurd*, Me., 360 A.2d 525, 527 n. 5 (1976).

There was also sufficient evidence from which the jury could have concluded that defendant engaged in the acts that caused Timothy's death either knowingly, intentionally, or in a manner manifesting a depraved indifference to the value of human life. The jury could have accepted Crystal's testimony that defendant swung Timothy around by his feet and let him go head first into the wall "for punishment" and either could have inferred from those facts that defendant knew or intended that his act would cause death or could have concluded that swinging a five-year-old child around by the feet and letting him go head first into a wall was conduct so shocking and heinous as to demonstrate a depraved indifference to the value of human life. The jury could have drawn the same conclusions from the testimony that defendant withheld food from Timothy for a substantial period of time, beginning at least in early November, 1978; and particularly in the light of Charles Amero's testimony that defendant said he would see Timothy "crawl on his hands and knees before he would feed him."

Moreover, the jury could also have found, on the basis of both direct and circumstantial evidence, that beginning at least in June, 1978, defendant engaged in a consistent course of abusive conduct directed against Timothy. On the basis of the testimony of Crystal Crocker and Charles Amero, the jury was justified in concluding that defendant had engaged in such practices as giving Timothy icewater baths, burning his hands in scalding water, making him stand for hours at a time with his hands over his head, withholding food, and beating him. The medical evidence revealed the consequences of that conduct in the form of bruises, scars, and burn marks. On the basis of all that evidence, the jury could have determined that the acts that finally caused Timothy's death were merely the culmination of a history of conduct that, taken together, reflected either intent to kill, knowledge that death would be practically certain to result, cf. 17-A M.R.S.A. § 10(1), (2), or depraved indifference to the value of human life.

Finally, the jury could have disbelieved defendant's testimony that he never abused Timothy, in light of the contradictory testimony of Crystal Crocker and Charles Amero. Determining what credence to give to the various witnesses and their testimony is a matter within the exclusive province of the jury. See State v. Doughty, Me., 399 A.2d 1319, 1326 (1979). In the light of the detailed medical testimony to the effect that the head injury and brain damage suffered by Timothy were consistent with a single blow to the head and that the bruises on the rest of his body appeared to be of varying ages, and that the pressure sores on Timothy's body were consistent with his having been bedridden for longer than just a day or two, the jury could have found incredible defendant's story on the witness stand that Timothy hit his head in a fall in the bathroom two days before he was hospitalized. Especially is that the case in light of the fact that defendant originally told Officer Placella of the Bangor Police Department on the night of Timothy's final hospitalization that the injury had occurred that very morning. The record amply supports the jury verdict of guilty of murder.

## IX. Other Contentions.

Defendant on appeal has asserted numerous other claims of error, including among others challenges to both the competency hearing that preceded his trial and the hearing that constituted the second portion of his bifurcated trial, following which the presiding justice concluded that defendant had not demonstrated that he was not criminally responsible for Timothy's death. We have carefully read the lengthy transcripts, giving close attention to each of defendant's claims of error. We find merit in none of them.

The entry must be:

Appeal denied.

Judgment affirmed.

CARTER, Justice, with whom GODFREY, Justice, joins, concurring:

I concur fully in Parts II through IX, inclusive, of the majority opinion and in the

result reached by the majority. I strongly disagree, however, with the scope of the holding in Part I of the majority opinion dealing with the Due Process of Law challenge to the "Depraved Indifference" murder statute, 17–A M.R.S.A. § 201(1)(B), and with the rationale put forth by the Court for that holding. My disagreement is founded upon what I consider to be the unnecessary "overbreadth" of the majority's consideration and decision of the constitutional issue. I believe the dimensions of the challenge to the statute should be determined by the facts of this case and that the Court's holding should be of the same restricted scope.

The majority states the central contention made by this defendant in challenging this statute as:

> ... [T]hat the depraved indifference murder statute requires no greater quantum of proof to secure a conviction than does the criminal negligence manslaughter statute [17–A M.R.S.A. § 203(1)(A)] ... and [that] any murder conviction *that might be* founded on the depraved indifference portion of the statute is arbitrary and thus invalid.

Majority Op. at 63 (emphasis added). It is my conviction that, on well established constitutional principles, the challenge, framed as broadly as it is, may not prevail. It is a critical error to enter into the consideration of the constitutionality of the statute (and ultimately to decide it) on the basis of an unquestioning acceptance of the defendant's overly broad statement of this challenge. The majority's failure to indulge in the appropriate propositional refinement of the question at issue leads it to enter upon hazardous ground where it need not and should not go, in this case.

I believe it to be sound doctrine that this Court should refrain from making judgments on the constitutionality of a statutory provision that are broader in scope than necessary to resolve the precise constitu-

tional question in the factual context in which it is raised. This policy of strict necessity in disposing of constitutional issues has been concisely stated as a rule that "... [c]onstitutional issues affecting legislation will not be determined ... in broader terms than are required by the precise facts to which the ruling is to be applied ... [or] at the instance of one who fails to show that he is injured by the statute's operation ...." *Rescue Army v. Municipal Court*, 331 U.S. 549, 569, 67 S.Ct. 1409, 1419, 91 L.Ed. 1667, 1678 (1947).[1]

This policy first emerged in our constitutional jurisprudence as a predicate upon which an appellate court might refuse to exercise its jurisdiction to review a lower court's determination as to the constitutionality of a legislative enactment. *See Rescue Army*. An early, concise statement of the principle, as such a predicate, was set forth in *Liverpool, New York and Philadelphia Steamship Co. v. Commissioners of Emigration*, 113 U.S. 33, 5 S.Ct. 352, 28 L.Ed. 899 (1884). In that case, the Court held that it would not consider a constitutional challenge to the validity of a statute absent a showing that the statute, properly construed, necessarily operated to bar recovery of the particular payments sought by the complaint. Implicit in this holding is the premise that the constitutionality of a statute is to be determined in the context of the specific facts of its application to the circumstances of the particular case. The Court discussed the operative principle in the following language:

> If, on the other hand, we should assume the plaintiff's case to be within the terms of the statute, we should have to deal with it purely as an hypothesis, and pass upon the constitutionality of an act of Congress as an abstract question. That is not the mode in which this court is accustomed or willing to consider such questions. It has no jurisdiction to pronounce

---

1. The defendant asserts that the statutory provision is violative of due process rights under *both* the State and Federal Constitutions. The application of federal due process standards is appropriate, since the limitations imposed by

the Maine Constitution upon the State to act on the subject matter of the statute are not any more demanding than the federally imposed restrictions. *See State v. Richardson*, Me., 285 A.2d 842, 844 (1972).

any statute, either of a State or of the United States, void, because irreconcilable with the Constitution, *except as it is called upon to adjudge the legal rights of litigants in actual controversies.* In the exercise of that jurisdiction, it is bound by two rules, to which it has rigidly adhered, one, never to anticipate a question of constitutional law in advance *of the necessity of deciding it*; the other never to formulate a rule of constitutional law broader than is required *by the precise facts to which it is to be applied.* These rules are safe guides to sound judgment. It is the dictate of wisdom to follow them closely and carefully.

*Id.* at 39, 5 S.Ct. at 355 (emphasis added).

The Court subsequently, in the *Rescue Army* case, invoked the policy again as a basis to decline to exercise its jurisdiction to review a lower court's determination of statutory constitutionality. The Court there went to particular pains to set forth the jurisprudential predicates of what it called its "... policy of strict necessity in disposing of constitutional issues." 331 U.S. at 568, 67 S.Ct. at 1419, 91 L.Ed. at 1678. The salient points of the analysis set forth in that case are: (1) that the policy is one of substance and not merely procedural or dis-

cretionary,[2] (2) that the reasons for the policy are a variety of considerations that go to the nature and function of judicial review as it properly operates within the context of the competing functions of the various departments of our constitutional scheme of government,[3] (3) that the impact of such considerations in the application of the policy cannot be abstractly identified or didactically prescribed,[4] (4) that the operation of the policy is not dependent upon the presence or absence of other nonconstitutional issues in the case,[5] and (5) that the policy is to be applied on a case-by-case basis.[6]

Although the *Liverpool* and *Rescue Army* cases, narrowly construed, stand only for the proposition that an appellate court ought not exercise its jurisdiction to entertain, in the course of appellate review, constitutional challenges which present only facial, general, or abstract attacks upon the constitutional validity of statutory enactments, the policy of strict necessity has not been so delimited in its application. In *United States v. Raines*, 362 U.S. 17, 80 S.Ct. 519, 4 L.Ed.2d 524 (1960), the United States Supreme Court expanded the impact of the policy by applying it directly as a substantive rule of law for purposes of re-

2. The policy is one of substance founded in considerations transcending any limitations imposed upon it that are procedural in nature or which should derive from "... the diversities of jurisdiction and procedure, whether of the state courts, the inferior courts, or this Court." 331 U.S. at 570, 67 S.Ct. at 1420, 91 L.Ed. at 1678–79.

3. The fundamental reasons for the policy "... lie in all that goes to make up the unique place and character, and our scheme, of judicial review of governmental action for constitutionality. They are found in the delicacy of that function, particularly in view of possible consequences for others stemming also from constitutional roots; the comparative finality of those consequences; the consideration due to the judgment of other repositories of constitutional power concerning the scope of their authority; the necessity, if government is to function constitutionally, for each to keep within its own power, including the courts; the inherent limitations of the judicial process, arising especially from its largely negative character and limited resources of enforcement; withal in the paramount importance of constitutional adjudi-

cation in our system." 331 U.S. at 571, 67 S.Ct. at 1421, 91 L.Ed. at 1679.

4. Such considerations "... cannot be reduced to any precise formula or complete catalogue." 331 U.S. at 573, 67 S.Ct. at 1421, 91 L.Ed. at 1680.

5. The operation of the policy in the most general sense is not circumscribed by limitations resulting from the fact that the policy has often been implemented by reliance upon the presence of other grounds for decision than those going to the issues raised by the constitutional challenge. "... [W]hen such alternatives are absent, as in this case, application must rest upon considerations relative to the manner in which the constitutional issue itself is shaped and presented." 331 U.S. at 573, 67 S.Ct. at 1421, 91 L.Ed. at 1680.

6. The application of the policy must be relative to the particular facts and procedural posture of the individual case in which the constitutional challenge is made. 331 U.S. at 575, 67 S.Ct. at 1423, 91 L.Ed. at 1681.

viewing the validity of a lower court determination of the unconstitutionality of a statute. The Court stated, "[w]e think that under the rules we have stated, the court should then have gone no further and should have upheld the Act *as applied in the present action,* and that its dismissal of the complaint was error." *Id.* at 27, 80 S.Ct. at 526, 4 L.Ed.2d at 532 (emphasis added). The "rules" to which the Court refers in its holding are those set forth in the *Liverpool* case, 113 U.S. at 39, 5 S.Ct. at 355, quoted *supra* at 78–79. The Court in *Raines* then made the following additional observation:

> Kindred to these rules is the rule that one to whom application of a statute is constitutional will not be heard to attack the statute on the ground that impliedly it might also be taken as applying to other persons or other situations in which its application might be unconstitutional.

362 U.S. at 21, 80 S.Ct. at 522, 4 L.Ed.2d at 529 (citations omitted).

The *Raines* case demonstrates that the policy of "strict necessity" in the disposition of constitutional challenges to legislation is not restricted in its application to questions of the propriety of the exercise of the court's jurisdiction on appellate review but that it is, as well, a substantive principle of law to be applied by appellate tribunals in reviewing the propriety of a lower court's decision determining issues of constitutional challenges to the validity of legislative enactments. The case also establishes that the application of the policy does not necessarily restrict the court to simply refusing to exercise its jurisdiction over a constitutional question. Nor does it require, or, indeed, properly permit the court to uphold facially *for all circumstances* the constitutionality of the statute in question. It states that the policy permits the court to set the dimensions of the constitutional issue presented in relation to the facts of the specific case and to determine the constitutionality of the statute in the context of those facts and the dimensions to be imput-

ed from them. Implicit in all of this is the proposition that the court may properly leave open, for later adjudication, questions of the constitutionality of the statute in other factual contexts.

This latter proposition was given direct application in *United States v. National Dairy Products Corp.,* 372 U.S. 29, 83 S.Ct. 594, 9 L.Ed.2d 561 (1963). There, the Court dealt with a constitutional challenge to the validity of § 3 of the Robinson-Patman Act, 15 U.S.C. § 13a, which made it a crime to sell goods at "unreasonably low prices for the purpose of destroying competition or eliminating a competitor." *Id.* at 29, 83 S.Ct. at 594, 9 L.Ed.2d at 563–64. This language was attacked as unconstitutionally vague and indefinite as applied to a sale below cost made by the defendants. On appeal, the defendant contended that § 3 was to be "tested solely 'on its face' rather than as applied to the conduct charged in the indictment...." *Id.* at 31, 83 S.Ct. at 597, 9 L.Ed.2d at 565.[7] The Court observed in deciding the case:

> It is true that a statute attacked as vague must initially be examined "on its face," but it does not follow that a readily discernible dividing line can always be drawn, with statutes falling neatly into one of the two categories of "valid" or "invalid" solely on the basis of such an examination.

*Id.* at 32, 83 S.Ct. at 597, 9 L.Ed.2d at 565. Citing the language of *Raines* and noting the Court's many holdings that statutes are not necessarily invalidated as vague simply because difficulty may be found in determining whether certain "marginal offenses" fall within their language, the Court stated that "[v]oid for vagueness simply means that criminal responsibility should not attach where one could not reasonably understand that his contemplated conduct is proscribed. ... In determining the sufficiency of the notice a statute must of necessity *be examined in the light of the conduct with which a defendant is*

---

7. See this Court's disposition of a case where the challenging defendant made a similar assertion of *facial* constitutional deficiency. *State v.*

*Richardson,* Me., 285 A.2d 842, 844–45, 846 (1972).

*charged." Id.* at 32–33, 83 S.Ct. at 597–598, 9 L.Ed.2d at 565–66 (citation omitted) (emphasis added). On this basis, the Court upheld the constitutionality of § 3 of the Act as applied to the sales alleged in the indictment at the case then at bar. That the Court's holding of the statute's constitutionality was limited in its scope by the facts of the case was made expressly clear by the Court. *Id.* at 36–37, 83 S.Ct. at 599–600, 9 L.Ed.2d at 568. Subsequently, in *Parker v. Levy,* 417 U.S. 733, 94 S.Ct. 2547, 41 L.Ed.2d 439 (1974), the Court held that the proper standard of review for a vagueness challenge to articles 133 [8] and 134 [9] of the Uniform Code of Military Justice [10] was that applied in the *National Dairy Corporation* case. The Court stated that:

> Since appellee could have had no reasonable doubt that his public statement urging Negro enlisted men not to go to Vietnam if ordered to do so were both "unbecoming an officer and a gentlemen," and "to the prejudice of good order and discipline in the armed forces," in violation of the provisions of Arts. 133 and 134, respectively, his challenge to them as unconstitutionally vague under the Due Process Clause of the Fifth Amendment must fail.

*Id.* at 757, 94 S.Ct. at 2562, 41 L.Ed.2d at 458. Similar application of the strict necessity policy may be seen in the case of *United States v. Mazurie,* 419 U.S. 544, 95 S.Ct. 710, 42 L.Ed.2d 706 (1975). In reversing a court of appeals' determination of the unconstitutionality of a statute, the Court noted that "[i]t is well established that vagueness challenges to statutes which do not involve First Amendment freedoms must be examined in the light of the facts of the case at hand. *United States v. National Dairy Products Corp.,* 372 U.S. 29, 83 S.Ct.

594, 9 L.Ed.2d 561 (1963)." 419 U.S. at 550, 95 S.Ct. at 714, 42 L.Ed.2d at 73. Likewise, in *United States v. Powell,* 423 U.S. 87, 96 S.Ct. 316, 46 L.Ed.2d 228 (1975), the Court sustained against constitutional challenge a federal statute prohibiting the mailing of firearms capable of being concealed on the person, 18 U.S.C. § 1715. Noting that the court of appeals, in sustaining the constitutional challenge, dealt with the statute generally and on a facial basis, the Court stated:

> While doubts as to the applicability of the language in marginal fact situations may be conceived, we think that the statute gave respondent adequate warning that her mailing of a sawed-off shotgun 22-inches-long was a criminal offense. Even as to more doubtful cases than that of the respondent, we have said that "the law is full of instances where a man's fate depends on his estimating rightly, that is, as the jury subsequently estimates it, some matter of degree."

*Id.* at 93, 96 S.Ct. at 320, 46 L.Ed.2d at 234 (citation omitted). The Court said that it would not strain to inject doubt as to the meaning of words in any situation where no doubt could be felt by the normal reader in construing the statutes under challenge for vagueness. The Court even went on to note that "[t]he fact that Congress might, without difficulty, have chosen '[c]learer and more precise language' equally capable of achieving the end which it sought does not mean that the statute which it in fact drafted is unconstitutionally vague." *Id.* at 94, 96 S.Ct. at 320, 46 L.Ed.2d at 325 (citation omitted).

The doctrine emanating from this line of cases is that except where First Amendment rights are at stake,[11] all constitutional

---

8.  10 U.S.C. § 933.

9.  10 U.S.C. § 934.

10.  10 U.S.C. §§ 890 *et seq.*

11.  This exception to the doctrine of "strict necessity" is acknowledged in *United States v. Powell,* 423 U.S. at 92, 96 S.Ct. at 319, 46 L.Ed.2d at 233 and in *United States v. Mazurie,* 419 U.S. at 550, 95 S.Ct. at 714, 42 L.Ed.2d at

713. The rationale for this exception is set forth in *United States v. Raines,* 362 U.S. at 22, 80 S.Ct. at 523, 4 L.Ed.2d at 530, as the inhibitory effect upon freedom of speech which would result from the application of the rules which make up the doctrine. The inhibitory impact of a statute upon speech requires "stricter standards of permissible statutory vagueness," since ". . . a man may the less be

challenges to legislation, with very few exceptions,[12] especially in the field of criminal law, based on federal due process of law are to be measured on an "as applied" basis rather than upon the basis of general or facial sufficiency of statutory language. *United States v. Channel*, 423 F.Supp. 1017 (D.Md.1976). Not surprisingly, this Court has previously adopted and applied this body of rules in deciding questions raised by constitutional challenges to various statutes. The Court stated in *State v. Richardson*, Me., 285 A.2d 842, 846 (1972):

> One who seeks to assert a particular conglomerate of circumstances in which the operation of the statute might be unconstitutional must prove such facts in an actual case to test the constitutionailty [*sic*] of the statute, as applied, rather than to seek to invalidate it on its face by hypothesizing marginal situations in which the statute might be conceived to operate with unduly oppressive or unjustifiably arbitrary impact indicative of unconstitutionality.

In the same opinion, the Court said by way of particular analysis:

> Hence, a constitutional attack, launched facially against . . . the statute at issue, and predicated upon due process and equal protection considerations, must fail when, as is true of the present statute, the core of the statute has reasonable application to a substantial expanse of situations clearly lying within the scope

of the evils which the State . . . may constitutionally seek to prevent. Regardless, therefore, of conceivable instances of over-inclusiveness, or excessiveness, at the fringes of . . . [the statutory language], *facial* constitutional attack must fail, *United States v. Raines* . . . ."

*Id.* at 845 (emphasis in original).

These principles should be observed here, for they have a long-standing and important place in the constitutional jurisprudence of this court. *Matheson v. Bangor Publishing Co.*, Me., 414 A.2d 1203, 1205 (1980) ("We have . . . reiterated the undesirability of the Law Court's deciding constitutional issues prematurely or otherwise than in the context of a fully developed factual situation that demands a constitutional decision."); *Osier v. Osier*, Me., 410 A.2d 1027, 1029 (1980) ("As a general rule courts should endeavor to resolve the controversies before them without deciding constitutional issues, reaching such an issue only '[if] it is entirely necessary to a decision on the cause in which it is raised.' *State v. Good*, Me., 308 A.2d 576, 579 (1973). . . ."); *Clardy v. Town of Livermore*, Me., 403 A.2d 779, 782 (1979) (". . . [I]t is a cardinal rule of appropriate judicial functioning that a court should avoid decision of a constitutional question where the legislative enactment that occasions the question is fairly open to an interpretation making decision of it unnecessary."); *State*

---

required to act at his peril here, because the free dissemination of ideas may be the loser." *Smith v. California*, 361 U.S. 147, 151, 80 S.Ct. 215, 217, 4 L.Ed.2d 205, 210 (1959). *See also Winters v. New York*, 333 U.S. 507, 509–10, 517–18, 68 S.Ct. 665, 667–68, 671–72, 92 L.Ed. 840, 846–47, 850–51 (1948); *Thornhill v. Alabama*, 310 U.S. 88, 97–8, 60 S.Ct. 736, 741–42, 84 L.Ed. 1093, 1099–1100 (1940).

12. Those exceptions are set out in *United States v. Raines*, 362 U.S. 17, 22–23, 80 S.Ct. 519, 523–524, 4 L.Ed.2d 524, 530 (1960) and it is said they exist because of the need to balance the application of the "strict necessity" doctrine against "weighty countervailing policies." *Id.* The only one of these exceptions that could conceivably bear upon the present case is that which the Court implies might exist if the application of the doctrine to sustain a statute's constitutionality ". . . [w]ould consti-

tute such a revision of its text as to create a situation in which the statute no longer gave an intelligible warning of the conduct it prohibited." *Id.* Treating the present statute on the facts of this case and in the light of our prior judicial interpretations of it does not require the extensive emasculation of its text required to make this possible exception applicable to this case. So interpreted, the statute gives ". . . clear notice that a reasonably ascertainable course of conduct is mandated. . . ." *United States v. Powell*, 423 U.S. 87, 92, 96 S.Ct. 316, 320, 46 L.Ed.2d 228, 234 (1975). The Fourteenth Amendment *does not completely proscribe* the Legislature from requiring a person, in assessing the legality of his conduct, to estimate rightly some matter of degree. *See Nash v. United States*, 229 U.S. 373, 377, 33 S.Ct. 780, 781, 57 L.Ed. 1232 (1913).

v. *Fitanides*, Me., 373 A.2d 915, 921 (1977) ("... [W]e note that our interpretation [of the statute] is in accord with the well-settled canon that a statute shall be construed in reasonable manner to avoid jeopardizing its validity on constitutional grounds."); *State v. Good*, Me., 308 A.2d 576, 579 (1973) ("As the complaint does not allege an offense, we arrive at a necessary disposition of this appeal without reaching the constitutional issues."); *Johnson v. Maine Wetlands Control Board*, Me., 250 A.2d 825, 827 (1969) ("It has long been the judicial policy of this Court to decline to pass upon the question of constitutionality of a statute unless this is entirely necessary to a decision of the cause in which it is raised."). *See also State v. Fantastic Fair*, 158 Me. 450, 466–67, 186 A.2d 352, 362–63 (1962); *McGary v. Barrows*, 156 Me. 250, 258, 163 A.2d 747, 752 (1960); *Baxter v. Waterville Sewerage District*, 146 Me. 211, 214, 79 A.2d 585, 587 (1951).

In point of fact, this Court has very recently sustained this very "Depraved Indifference" murder statute against federal due process attack for vagueness on an "as applied" rationale. *State v. Flick*, Me., 425 A.2d 167, 174 (1981). We stated in that case:

> In *State v. Parker*, Me., 372 A.2d 570, 573 (1977), we said:
>
>> A criminal statute fails to give fair warning of its scope, in accordance with due process requirements, if "a person of ordinary intelligence" could not "reasonably understand" that it forbids the conduct for which he is criminally charged, *United States v. Hariss*, 347 U.S. 612, 74 S.Ct. 808, 98 L.Ed. 989 (1954).
>
> We cannot find that § 201(1)(B) falls so far short of this standard as to have denied *defendant* a fair trial.

*Id.* (emphasis added). Such a holding can only be interpreted as a determination that the statute "as applied" to the facts in *Flick* did not violate federal due process rights of the defendant. I see no need to go further, as a matter of rational technique, in the present case than did the Court in *Flick*.

We have previously construed the statute in question in this case as being intended to impose criminal liability for the offense of murder where death has resulted from conduct of the accused which has "created such a high tendency to produce death that the law attributes to him the highest degree of blameworthiness." *State v. LaGasse*, Me., 410 A.2d 537, 540 (1980). We have said that it was the legislative intent to punish as murder conduct which a jury would find to be "so heinous in the eyes of the law as to constitute murder." *State v. Woodbury*, Me., 403 A.2d 1166, 1173 (1979). I have no difficulty with construing the statute as intended to proscribe conduct resulting in death which a defendant should have known would create a "very high degree" of risk of death or serious bodily injury under circumstances making it unjustifiable for the defendant to take such a risk. It is apparent to me that such a construction fairly represents the legislative intent in enacting the statute.

Accepting all of that, I submit that it is necessary for us, in testing the constitutionality of this statute for purposes of the present attack, to determine *only* whether the conduct of this defendant in bringing about the death of this victim, *as disclosed by the evidence in this case*, leaves any room for reasonable doubt as to whether his conduct was within the standard of conduct intended by the Legislature to qualify for punishment as murder. There is no need for us to go to a facial reading of the statute.

Accepting the stated modality of analysis, there can be no question on the facts of this case but that the conduct of the defendant which resulted in the death of this five-year-old child was so egregious, in terms of its culpability, that the Legislature intended by the "Depraved Indifference" murder statute to punish that conduct by conviction for the offense of murder. The majority states, and it is undeniably true, that the only distinction between depraved indifference murder and manslaughter by criminal negligence is one of degree. Distinctions of degree are often operative in determina-

tions of criminal responsibility. To characterize a distinction of levels of criminal offense, however, as one of degree is not to resolve the potential constitutional problem that is raised by a challenge for vagueness. Where there is no basis from the language of the statute (even as amplified by our interpretative judicial glosses upon it) nor by interpolation from the facts to which the statute is applied, for a discernible demarcation point at which the degree of culpability involved passes from that which is sufficient for one offense to that required for a higher offense, the potential for constitutional deficiency persists. The Holmesian acceptance of distinctions of degree [13] is simply a recognition of a particular modality of legislative expression and judicial analysis and not an abolition of all requirements of reasonable clarity and certainty where degrees of conduct are to determine significantly different levels of punishment. The need for analysis may continue, even where the test is one of degree, depending on the facts of the particular case raising the challenge to the specific language and standards of the statute.

The evidence in this case reveals that the victim, Timothy, was severely malnourished and dehydrated when admitted to the emergency room. These were conditions consistent only with an extended period of deprivation of food and water. He had suffered an injury to the right side of his head, the entire portion of which was covered by bruises. He was comatose. He had suffered severe brain damage. He was near death. His body was covered with bruises, discolored areas, scrapes, and abrasions of varying ages. There were numerous burn marks on his body and extremities, which could have been made by cigarettes. His heels and other parts of his body had pressure sores, a condition that indicated that Timothy had been lying in one position for several days. Dr. Irwin testified that the trauma causing the brain damage would have caused Timothy to lose consciousness immediately upon its occurrence. He said that the damage was consistent with a single blow. He also said that the various bruises and burns of differing ages were consistent with a continuing pattern of child abuse. The boy ultimately died of the combined effects of starvation and of his head injury.

There was also sufficient evidence from which the jury could have found, as the majority points out, that the defendant, for purposes of disciplining him, swung Timothy around by his feet and let him go head first into the wall. Surely, the jury could have inferred, on this record, that defendant knew that his act precipitated a very great and unjustified hazard of Timothy's death; or that he could have concluded that swinging a five-year-old child around by the feet and letting him go head first into a wall was conduct so shocking and heinous as to demonstrate a depraved indifference to the value of human life such as to create a very high degree of risk of death. The jury could have found that the victim's debilitated, emaciated, weakened condition existed at the time the defendant threw him violently against he wall, making that conduct even more reprehensible and likely to result in death.

On such facts as these, there is no need to reach out, in sustaining this particular conviction, to uphold the constitutionality of this statute as it may apply to all future circumstances. We should depart from our well-established policy of judicial restraint in dealing with constitutionally based assaults upon statutory validity only where:

> ... [N]o refinement or clarification of issues which we can reasonably anticipate would bring into better focus the question of whether the contested section is written so vaguely and indefinitely that *one whose conduct it affected* could only guess what it meant.

*United States v. Petrillo*, 332 U.S. 1, 6, 67 S.Ct. 1538, 1541, 91 L.Ed. 1877, 1882 (1946) (emphasis added).

I have doubt that the statute can be successfully defended in all circumstances against challenge for vagueness. But I

---

**13.** Majority Op. at 67, n. 7.

have no doubt whatever that testing this statute as it applies to the facts of this defendant's conduct, as revealed by the evidence in this record, the statute gave the defendant adequate notice that his conduct in question was proscribed by the statute and that the Legislature intended conduct of such a heinous level of culpability to be punishable as murder when it resulted in death. This is the only basis on which the defendant has any right to challenge the validity of the statute. *United States v. Raines*, 362 U.S. at 21, 80 S.Ct. at 522, 4 L. Ed.2d at 529; *State v. Richardson*, 285 A.2d at 846. It is necessary to go only that far in order to establish that the defendant has not been deprived of any established federal or state due process right by the application of this statute to his conduct. On this basis, the conviction is obviously properly sustained, the statute survives and what may be the very viable and challenging issues as to whether its application will survive attack in "marginal" factual situations remain open for decision on another day when *necessity* shall require their adjudication. *See United States v. Powell*, 423 U.S. at 93, 96 S.Ct. at 320, 46 L.Ed.2d at 234.